This is a suit by vendees (husband and wife), to obtain the rescission, surrender and cancellation of a recorded contract for the purchase of land and a dwelling at 263 White Horse Pike, Audubon, New Jersey, and the declaration of a vendee's lien on the premises for $2,400, down-money paid on account of their attempted purchase. Time was stipulated to be of the essence of the contract, and it is the contention of the complainants that the defendants defaulted by failing to appear and settle at the hour and place fixed.
Joining issue, the defendant-vendors advanced many questions of fact for resolution by this court: (a) that time was not, in fact, of the essence; (b) that complainants orally agreed to a postponement of the settlement and then failed to appear and perform, whereby the complainants defaulted and *Page 156 
forfeited to the defendants their down-payment of $2,400; (c) that complainants are barred of relief by their laches; (d) that complainants have not performed "to an extent" which would entitle them to relief; (e) that complainants did not put the defendants in default by notice before institution of this suit; (f) that complainants have an adequate remedy at law; and (g) that no lien may be declared upon the premises because they have been conveyed for value and this suit was not instituted and alis pendens filed within three months after the date stipulated in the contract for its consummation, as required by R.S.46:21-3.
The contract was dated September 7th, 1946. The purchase price was $12,000, $1,000 down, $5,000 at settlement, and $6,000 to be secured by execution of a purchase-money mortgage. It was stipulated that settlement was to be made at the office of the vendors' broker November 15th, 1946, at 4 P.M., that time was of the essence, that if the vendees did not make settlement in accordance with its terms "the payment or payments" made on account would be forfeitable as liquidated damages at the option of the vendors, and that the complainants take title subject to the tenancy of the occupants.
The sale was negotiated by a salesman of defendants' real estate broker. Complainants made an initial payment to him of $100 and it was understood that the broker would prepare a formal contract. When that instrument was ready for execution, the broker asked complainants for $2,350 instead of $900 ($1,000 being the amount agreed upon orally and written in the contract), explaining that a governmental agency required twenty per cent. of the consideration to be paid as a prerequisite to any dispossession proceedings against the tenant, and that a deposit of $50 was necessary to secure title searches. The complainants, being anxious to gain early possession of their property, gave the broker $2,350. The defendants now call attention to the fact that the printed contract provides for a forfeiture — not of "the payment" made on account but of "payment or payments," and claim $2,400.
The original answer filed herein asserted, by way of a separate defense, that the time fixed for settlement in the *Page 157 
contract was extended from November 15th to November 19th at two o'clock in the afternoon and that, at the latter time, defendants "tendered an executed deed to the complainants." Also, that complainants did not appear, nor did anyone for them, and that, immediately thereafter, the defendants caused notice to be forwarded to them that at two o'clock in the afternoon of November 26th, 1946, the defendants would appear at the office of their broker for the purpose of again tendering to complainants a deed for the premises and for settlement in accordance with the "then existing terms" of the contract. And that, at two o'clock in the afternoon of November 26th the defendants appeared at the place designated and caused a duly executed deed for the lands to be tendered, and then caused a notice to be sent to the complainants that the defendants had, "in accordance with the terms of said Agreement elected to forfeit the down payment made by the complainants due to the default of the complainants."
When the cause was called for final hearing defendants submitted an order amending their answer and, as the complainant would not be prejudiced, it was advised. The effect of the amendment was to present a different statement of fact, viz., that, by oral agreement, the time fixed for settlement in the contract was extended from November 15th to November 26th, at two o'clock in the afternoon, and the complainants then not appearing the defendants elected to declare a default and forfeiture.
After the broker had requested and obtained $1,400 more than the complainants had expected to pay as earnest money, Dr. Reilly repeatedly inquired of the broker's representative as to when and how complainants could obtain possession of their property, and what the additional cost would be to them for conveyancing and the like. When the doctor failed to obtain any satisfactory answers to his inquiries, he became suspicious of the defendants and their broker. On the day before the day designated for settlement, those suspicions were augmented. First, he received a letter from the broker stating that settlement would be made on the "19th" "according to your agreement of sale" — and his agreement read the *Page 158 
15th. A little later he received a telephone message from the broker's office that the "19th," written in the letter, was incorrect and a mistake of a stenographer. The doctor decided he needed legal advice and assistance, and immediately retained his present solicitor.
At four o'clock in the afternoon of November 15th the complainants, their attorney and another attorney associated with him, were at the place designated for settlement "ready, desirous, prompt and eager" to perform. Meidling v. Trefz,48 N.J. Eq. 638, 644; 23 Atl. Rep. 824; Vandermade v. Appert,125 N.J. Eq. 366, 371; 5 Atl. Rep. 2d 868. They were received by a settlement clerk. The defendants did not appear. Complainants made formal tender of the cash balance due and offered to execute the purchase-money mortgage which, it is admitted, was to have been prepared in the broker's office. The settlement clerk did not have the deed or the mortgage and he was otherwise unprepared to make settlement for the defendants. Complainants left the office. They waited three days and then, on November 18th, 1946, their attorney wrote the broker, called attention to the defendants' failure to appear and settle, and requested repayment of the moneys paid, $2,450.
Two days later, November 20th, 1946, the broker wrote directly to Dr. Reilly: "Confirming your telephone conversation with this office on last Thursday, November 14th, 1946, we have scheduled your settlement covering the above property, to be held here in our office, on Tuesday, November 26th at 2:00 P.M. We shall look forward to seeing both you and Mrs. Reilly here at that time." The complainants, having declared a default on the part of the vendors and having asked for the return of their deposit moneys, did not appear at the broker's office on November 26th. Nor, did the defendants appear, except by attorney. However, that very afternoon the broker wrote to Dr. Reilly declaring that the complainants' failure to settle at two o'clock constituted a default and that the sellers had elected a forfeit of the moneys paid and a termination of "any further interest" the complainants might have in the property. Shortly thereafter, this suit was instituted and a lis pendens was filed. *Page 159 
July 10th, 1947, the defendants sold and conveyed the premises to the tenants in possession. The latter had not only had actual notice of the purchase of the property by the complainants but, at the time of their purchase, this suit was pending and the lispendens was on file in the office of the local register of deeds.
 (a) Was time, in fact, of the essence?
This issue, advanced by the defendants, will be first discussed because upon its resolution depends the determination of other controverted questions of fact and law. It is conceded, of course, that the contract fixed a day and hour for performance, declared time to be of the essence, and provided for a forfeiture by the vendees of moneys paid on account if they did not make settlement in accordance with its terms. These stipulations of the contract, drawn by the defendants' broker, all demonstrate the intention of the defendants to make time of the essence, and to force the complainants to settle on time.
The intention of the complainants to make time of the essence was engendered of very practical and pressing circumstances. A revelation of their situation will also explain their willingness to risk the possible forfeiture of $2,450. Dr. Reilly and his wife were living in Audubon with her parents; he was attempting to establish a medical practice from a rented room at 412 White Horse Pike; she was pregnant and had been ill; the White Horse Pike property they were buying would provide the doctor with desirable and permanent professional offices, and would permit the complainants to establish a home of their own. Complainants were forced, however, to buy their property subject to the occupancy of the tenants which, under war-time regulations, might well mean litigation and delay in obtaining possession. Persuasive of complainants' anxiety for prompt settlement and possession was their payment, upon request of defendants' representative, of $1,500 more than they had expected or agreed to pay as a deposit. Also indicative of Dr. Reilly's insistence upon settlement on the day fixed in the contract is the circumstance that, when it was indicated by the defendants' broker that settlement was to be postponed from the 15th to the 19th, he *Page 160 
immediately retained an attorney and appeared for settlement as agreed.
It is noteworthy that the defendants themselves claim a forfeiture against the complainants because they did not appear and settle at the time to which, the defendants say, settlement was postponed. It further establishes their intent to make time of the essence in the written contract. I am convinced, and I find, that time was not only stipulated in the written contract to be of the essence, but was, in fact, intended by both the complainants and the defendants to be of the essence.
 (b) Was there, in fact, an oral agreement to extend the timefor settlement?
This issue, also raised by the defendants, is based upon the testimony of their broker's stenographer. She testified that, noticing she had made a mistake in transcribing the letter of November 13th, she telephoned to Dr. Reilly, advised him of the error and obtained his consent to a postponement of settlement until two o'clock in the afternoon of November 26th. Dr. Reilly testified most emphatically that he gave no such consent.
Realizing that my finding of fact on this issue might well depend upon the credibility of these witnesses, I carefully observed and judged both Dr. Reilly and the stenographer as they gave their testimony. I accept the testimony of Dr. Reilly, and find that there was no agreement to postpone settlement. His words and his manner of testifying impressed me most favorably, and his testimony was in accord with his precedent and subsequent conduct and with circumstances that I know occurred. I also conceive that the stenographer who made the error would naturally wish to repair damage done and that this might influence her testimony. If she had, in fact, succeeded in persuading Dr. Reilly to agree to a postponement, it seems to me that she would have immediately written a letter confirming the arrangement or at least made an explanatory office memorandum. A letter of confirmation was, indeed, written by her employer, but it was dated five days after the true settlement date and one day after he must have received the letter of complainants' attorney demanding the return of moneys paid. *Page 161 
A further circumstance: When the complainants appeared at the broker's office to make settlement, the settlement clerk obtained and examined the office folder pertaining to the purchase. It seems to me significant that he did not call the attention of complainants' attorney to an office copy of the letter giving the 19th as the day of settlement or to a memorandum indicating a postponement until the 26th, or call in the stenographer who had written the letter and whose initials appeared thereon. It also seems to me most significant that the letter purporting to confirm the alleged extension was not written until after the complainants had appeared in the broker's office with two attorneys and made a formal tender, and after the letter of complainants' attorney demanding return of the deposited moneys, must have been delivered.
 (c, d, and e) Are complainants barred of relief by theirlaches, or because they have not shown a sufficient endeavor, ontheir part, to perform, or because they did not put thedefendants in default before institution of this suit?
While the defendants advance the special defense of laches in their answer and urge it in their brief, I cannot find in the conduct of the complainants any delay that would bar them from relief. When a defense of laches is interposed, a cause will be judged upon the facts and circumstances peculiar to it. Here, the parties were exchanging notices and demands until December 23d 1946. This suit was instituted March 7th, 1947. There has been no proof that this delay in anywise injured or prejudiced the defendants. To bar a complainant's right to relief by laches "There must be delay for a length of time which, unexplained and unexcused, is unreasonable under the circumstances, and which has been prejudicial to the defendant." Hinners v. Banville
(Court of Errors and Appeals), 114 N.J. Eq. 348, 357;168 Atl. Rep. 618.
Defendants say that complainants should be barred of relief because they did not, when they tendered the cash balance of the consideration, also tender an executed purchase-money mortgage in the sum of $6,000, and did not submit to the defendants "forms of bond and mortgage for approval" as required by the contract. The contract does not call for a *Page 162 
bond, it calls only for the execution of a $6,000 purchase-money mortgage, "on forms acceptable to the seller." Until the day designated for settlement both the complainants and the defendants entrusted defendants' broker with the conveyancing work and with the responsibility for assuring good title. The broker's stenographer testified that she was to draw both the deed and the mortgage. When the time for settlement arrived she had not prepared the mortgage. The complainants, however, were in the office, ready and willing to execute that instrument. It would be most unconscionable to bar them of relief in this court because they did not perform an act which would have been useless, or because they did not actually execute and acknowledge a paper which the defendants' broker had failed to prepare.
The defendants say further that the complainants did not put them in default by notice before institution of this suit. This point was not briefed and, I assume, was abandoned. Certainly there is nothing in the evidence upon which defendants' argument could be properly based. The fact is, as I have found, that the complainants gave notice to the defendants' broker on or about November 19th, 1946, that the defendants were in default. They notified the defendants to the same effect December 27th, 1946.
 (f) Is there an adequate remedy at law?
The contract was drafted by the defendants' broker. Time was made of the essence and the vendees were required to be punctual, or risk the forfeiture of moneys paid. The contract was mutual, and when the vendors did not make or tender settlement at the time stipulated, they defaulted. Bernstein v. Kohn (Court ofErrors and Appeals), 96 N.J. Law 223, 226; 114 Atl. Rep. 543.
There was no default on the part of the vendees. These facts and eventualities being envisioned, the changed status of the parties in the view of equity becomes evident. "The vendor still holds the legal title, but only as a trustee, and he in turn acquires an equitable ownership of the purchase-money; his property, as viewed by equity, is no longer real estate, in the land, but personal estate, in the price, and if he dies before payment, it goes to his administrators, and not to his heirs. In short, equity *Page 163 
regards the two contracting parties as having changed positions, and the original estate of each as having been `converted,' that of the vendee from personal into real property, and that of the vendor from real into personal property. Although these primary rights which equity thus creates are very different from those which the law recognizes, there is still no conflict or antagonism between the two. While equity gives to the purchaser a property in the land, and furnishes him with its specific remedies to maintain and enforce that ownership, at the same time it does not deny nor interfere with his legal primary right against the vendor personally arising from the contract. The vendee in fact has an election." Pom. Eq. Jur., § 105.
The equitable concept of a "conversion" was declared in the early English cases of Burgess v. Wheate, 1 Eden 177; 28 Eng.Reprint 652; Wythes v. Lee, 3 Drewry 395; 61 Eng. Reprint 954,956, and Rose v. Watson, 10 H.L. Cas. 672; 11 Eng. Reprint1187, and approved and adopted by our own Court of Errors and Appeals in Haughwout Pomeroy v. Murphy, 22 N.J. Eq. 531,546. In the latter case Mr. Justice Depue said: "In equity, upon an agreement for the sale of lands, the contract is regarded, for most purposes, as if specifically executed. The purchaser becomes the equitable owner of the lands, and the vendor of the purchase-money. After the contract, the vendor is the trustee of the legal estate for the vendee."
As a natural result of the recognition of a trust relationship between the vendor and the vendee, after contract executed, payment of part of the consideration and a default, equity also recognized the existence of vendors' and vendees' liens. Of the vendees' lien, Lord Cranworth said in Rose v. Watson, supra:
"There can be no doubt, I apprehend, that when a purchaser has paid his purchase-money, though he has got no conveyance, the vendor becomes a trustee for him of the legal estate, and he is, in equity, considered as the owner of the estate. When, instead of paying the whole of his purchase-money, he pays a part of it, it would seem to follow, as a necessary corollary, that, to the extent to which he has paid his purchase-money, to that extent the vendor is *Page 164 
a trustee for him; in other words, that he acquires a lien,exactly in the same way as if upon the payment of part of thepurchase-money the vendor had executed a mortgage to him of theestate to that extent." (Italics supplied.) And, in Fry,Specific Performance 672 § 1480, it is said: "On the same principle the purchaser has a lien for his deposit, not only when the contract goes off for want of title, but also when it isrescinded under a condition entitling the purchaser, or thevendor, to rescind." (Italics supplied.)
Professor Pomeroy reminds us that the vendee's lien arises only"when the vendor is in some default for not completing thecontract according to its terms, and the vendee is not in defaultso as to prevent him from recovering the purchase-money paid." 4Pom. Eq. Jur., § 1263. (Italics supplied.)
It should be observed, I think, that this equity is not created by the court. It may be recognized, declared, or impressed in equity, but it arises out of facts and circumstances, and exists independently of the court. The right of the possessor of an equitable lien is the right to come into the Court of Chancery and have that lien recognized, declared and, if necessary, enforced. Now a court of equity has long been recognized as the appropriate tribunal for the enforcement of an equitable lien, for a lien or charge in rem necessarily bespeaks a trust, and is accordingly governed by the general principles applicable to trusts. In Jones on Liens, § 93, we read: "But wherever there is full equity jurisdiction — that is, an equity jurisdiction coincident and coextensive with that exercised by the Court of Chancery in England — there is jurisdiction for the enforcement of any equitable lien or charge; and, unless there be a special remedy provided by statute, this jurisdiction should be invoked for the enforcement of any equitable lien." And in section 94:
"At law there is no remedy beyond retaining possession."
Our modern encyclopedic authorities are to the same effect: "It is settled beyond question that a court of equity is the appropriate tribunal for the enforcement of an equitable, as distinguished from a statutory or common-law, lien. Moreover, since equity has brought into existence liens unknown to the common law, it can enforce them by whatever means *Page 165 
they will be rendered more efficacious in doing justice to the parties interested." 33 Am. Jur., Liens, § 45. "An equitable lien of course may be enforced in a court of equity, which in fact is the only proper tribunal for enforcing such a lien, regardless of what rights the lienor may have in a court of law."37 C.J., Liens, § 65.
As early as 1830, an equitable lien upon land in favor of a vendee was recognized and enforced in this court. Copper v.Wells, 1 N.J. Eq. 10. Since that decision, there has been, however, much discussion in this court and in the Court of Errors and Appeals, and some confusion, respecting the enforcement of a vendee's lien for purchase-money paid under a contract for the sale of land. In 1874 Chancellor Runyon declared and impressed a lien on the separate estate of a married woman in land agreed to be sold, to assure repayment to the vendee of moneys expended in improvements thereon, made on the strength of the contract. On the reasoning and authority of Rose v. Watson, supra, the lien was recognized by Chancellor Runyon and enforced. Pierson
v. Lum, 25 N.J. Eq. 390. However, the question of the existence and enforcement of a vendee's lien for purchase-money paid was first definitely presented to this court in 1901, in Craft v.Latourette, 62 N.J. Eq. 206; 49 Atl. Rep. 711.
The dismissal of vendees' bills by this court was affirmed inSchweitzer v. National House and Farms Association, Inc.,93 N.J. Eq. 644; 117 Atl. Rep. 701; in Bailey v. B. Holding Co.,Inc., 104 N.J. Eq. 241; 144 Atl. Rep. 870; and in Grunt v.Olsan, 104 N.J. Eq. 242; 144 Atl. Rep. 870. In those cases the pleadings were so drafted that the suits amounted to no more than actions for the recovery of money had and received.
This court was reversed in Clark v. Badgley, 104 N.J. Eq. 260; 145 Atl. Rep. 232; 105 N.J. Eq. 534; 148 Atl. Rep. 736, on the ground that: "The Court of Chancery is without jurisdiction to hear and determine the controversy. The question litigated is a pure legal question, viz., the breach of a contract cognizable by the common law courts." "The fact that the Court of Chancery is asked to declare a lien on the land does not differentiate the case in a legal aspect, from the cited case." *Page 166 
Then came Richeimer v. Fischbein, 105 N.J. Eq. 627;149 Atl. Rep. 26. Vice-Chancellor Church reviewed the authorities and came to the conclusion that equity had jurisdiction of a bill to declare and enforce a vendee's lien for purchase-money paid under an agreement for the purchase and sale of land, because that lien was a purely equitable right. However, when the Vice-Chancellor's attention was called to the then recent decision of the Court of Errors and Appeals in Clark v. Badgley, supra, he said that, in spite of what he had written, he was constrained to advise a decree dismissing the bill. The decree of dismissal was reversed by the Court of Errors and Appeals, 107 N.J. Eq. 493;153 Atl. Rep. 514. Mr. Justice Bodine speaking for the court, said: "From our reading of the bill, answer and reply, it is apparent that the issue tendered to the court was whether by reason of defects the complainant was entitled to rescind, or whether a decree for specific performance should be entered." Mr. Justice Bodine reviewed the authorities at great length and distinguished the cases of Goldstein v. Ehrlick, 96 N.J. Eq. 52;124 Atl. Rep. 761; San Giacomo v. Oraton Inv. Co., 103 N.J. Eq. 273;143 Atl. Rep. 329; Clark v. Badgley, supra, and Bailey v. B. HoldingCo., supra. Of the latter three decisions, he said: "Those cases go no further than to hold that where the purchaser does not seek specific performance or cancellation of a contract for the saleof land, a court of equity has no jurisdiction to compel the repayment of the down-money or to enforce a lien therefor." (Italics supplied.)
Apparently, since the Court of Errors and Appeals decision inRicheimer v. Fischbein, supra, in 1930, there have been but two decisions reported on this subject. In Brauer v. Trusteesof First Methodist, c., Church (Court of Errors and Appeals),124 N.J. Eq. 247; 1 Atl. Rep. 2d 409, a bill praying "cancellation" (not a surrender) of the contract and the impressment of a lien for moneys paid, plus reasonable costs incurred in examining title, was dismissed by Vice-Chancellor Berry, and that dismissal was affirmed by the Court of Errors and Appeals on the ground that the complainant had a complete remedy at law in a suit for damages, "since there is no allegation that the defendant is not financially *Page 167 
responsible." In Vandermade v. Appert, supra, Vice-Chancellor Egan advised that the specific performance prayed by the complainant be denied and that the defendant, on her counter-claim, was entitled to a return of the deposit and such fees and expenses as were incurred by her.
In the Errors and Appeals cases I have cited, points were emphasized which are particularly apt to the present discussion. Mr. Justice Bodine, in the Richeimer Case said: "The purchasermay seek the aid of a court of equity if he properly frames hispleadings." Again: "The recent decisions of this court, when carefully examined, will show the distinction between cases in which there is a prayer for specific performance, or forcancellation and surrender of a written instrument, in which avendee's lien is proper as incidental to a case of purelyequitable cognizance, and cases in which the vendee merely asks the return of money paid without more." (Italics supplied.)
In concluding his opinion, Mr. Justice Bodine said:"Obviously, an issue over which the Court of Chancery hasjurisdiction was tendered to that court, which consequently could apply its equitable remedies, and the dismissal of thebill without hearing the proofs in support of the pleadings waserror." And, "where, as in Rose v. Watson, supra, the purchaser properly invokes the jurisdiction of the court and it would be inequitable to compel specific performance, so far as the payments on the purchase price have been made, they may be recovered and there is in equity a lien on the estate to secure the same. The pleadings in the present case presented to the Court of Chancery the issue of whether or not the seller was entitled to specific performance, and if he was not whether this was due to any misconduct on the purchaser's part. The factquestions were for the Court of Chancery and upon a properdetermination thereof the relief prayed depended." In Brauer
v. Trustees of First Methodist, c., Church, supra, Mr. Justice Trenchard said: "Moreover, the bill of complaint does not ask for specific performance, nor for a surrender of the writtenagreement." (Italics supplied.)
In the instant case, as in the Richeimer Case, the pleadings presented to this court questions of fact, the determination *Page 168 
of which would control the granting or refusal of relief. Furthermore, in the present case, the complainants did pray the surrender and cancellation of the contract. Here too, the defendants submitted themselves to equity, seeking a decree that would, in effect, declare the complainants had defaulted and that defendants had not, thus insuring the retention by them of the moneys they had declared forfeited. True it is that, in the present case, neither the complainants nor the defendants sought specific performance of the contract. But surely that alone would not have been sufficient warrant for this court to refuse to hear and determine the issues of fact tendered. And the complainants are, upon the facts as I have resolved them, entitled to have the defendants' contract surrendered and canceled, something that cannot be accomplished at law.
Until a surrender of the contract is effected, the complainants will not be free of the threat of a suit at law for damages. Have not the defendants and their tenants who knew of complainants' contract to purchase and should have known of this suit, gone ahead and completed a second sale for (it is said) a reduced price? And, are not the defendant-vendors willing, even anxious, to advantage themselves of a statute passed to protect vendees and to stabilize titles? Unless their lien (declared by Lord Cranworth to be like a mortgage) is here recognized and enforced, what hope can the complainants have of an ultimate recovery of their money by suit? Certainly, in this court of conscience, issues of fact having been tendered and resolved in favor of the complainants, it would not be just to ignore the complainants' presently existing lien and to leave them to pursue an uncertain and incomplete remedy at law.
 (g) Is the declaration of a lien precluded by R.S. 46:21-3?
In the instant case I conceive that, although the statute may preclude the imposition of a lien adversely affecting the interest of the holder of title for value, this circumstance is not dispositive of complainant's prayer for enforcement of their lien. The defendants have retained an interest in the lands of more than sufficient value to ensure such repayment *Page 169 
if the lien is declared and enforced promptly. When the defendants conveyed to the second purchaser they took back a purchase-money mortgage for $6,000. They still hold that bond and mortgage. They should not be permitted to sell and assign for value, to an innocent buyer, their present interest in the land they agreed to sell to the complainants and for which they took $2,400, unless and until they satisfy complainants' lien.
A mortgage is not only an interest in lands but the privileges and powers inherent in a mortgage and forming a necessary and important part of it are also interests in lands. George v.Meinersmann (Court of Errors and Appeals), 119 N.J. Law 460;197 Atl. Rep. 1; Wujciak v. Wujciak (Court of Chancery),140 N.J. Eq. 487; 55 Atl. Rep. 2d 164. Assuredly then, the statute R.S. 46:21-3 cannot preclude this court from declaring that the complainants have a lien against the interest of the defendants in the lands they agreed to sell to the complainants to the extent of the amount paid by the complainants to the defendants on account of the purchase price. While relief in this exact form seems never to have been sought of this court, or granted by it, I have no hesitation in advising it. Every consideration of conscience and of justice requires such action, and there is some precedent for it to be found in Pierson v.Lum, supra, and in Wythes v. Lee, supra.
There is no lien for the money deposited to cover search fees. Under other circumstances, and as incidental relief to the equitable relief granted, this court might direct payment of the cost of searches ordered by the complainants on the strength of their purchase. In this instance, however, there is no proof as to the actual amount lost, and the moneys were paid over by the complainants to the defendants' real estate broker who was, in this respect, to act as the agent for the complainants.
A decree conforming to this opinion may be submitted. *Page 170