134 N.J. Super. 557 (1975)
342 A.2d 523
MIHRANIAN, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
SAMUEL J. PADULA AND BOND AND MORTGAGE COMPANY OF NEW JERSEY, A CORPORATION OF THE STATE OF NEW JERSEY, AND VILLA MADRID, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS-THIRD PARTY PLAINTIFFS-RESPONDENTS,
v.
JERSEY COAST SEARCH AND ABSTRACT COMPANY AND COMMONWEALTH LAND TITLE INSURANCE COMPANY, THIRD PARTY DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 21, 1975.
Decided June 17, 1975.
*559 Before Judges HALPERN, CRAHAY and ACKERMAN.
Mr. Mark F. Saker argued the cause for appellant (Messrs. Cerrato, O'Connor, Braelow & Mehr, attorneys; Mr. Saker on the brief).
Mr. Alexander Feinberg argued the cause for respondent, Bond and Mortgage Company of New Jersey (Messrs. Evoy and Feinberg, attorneys; Mr. William I. Evoy on the brief).
Mr. Gregory V. Sharkey argued the cause for respondent, Villa Madrid, Inc. (Messrs. Citta, Gasser, Carluccio, Holzapfel & Sharkey, attorneys; Mr. Sharkey on the brief).
Mr. Garry J. Roettger argued the cause for respondents, Jersey Coast Search and Abstract Company and Commonwealth Land Title Insurance Company (Messrs. Hiering, Grasso, Gelzer, Kelaher, attorneys).
J.A. ACKERMAN, J.A.D.
This appeal presents a question of some novelty with respect to enforcement of a vendee's lien.
*560 The decision of the court below was based upon an oral stipulation of facts, formulated and agreed to by the parties on the scheduled date for hearing before the court. The salient facts may be summarized as follows:
On April 30, 1971 Samuel J. Padula, as vendor, and Mihranian, Inc., as vendee, entered into a written contract for the sale and purchase of certain land known as Section 2, Brookside Estates, in Dover Township, containing 39 prospective lots, and a deposit of $10,000 was paid by Mihranian. The contract provided that if Padula did not obtain subdivision approval for the 39 lots within six months, then, at Mihranian's option, the contract could be declared null and void, in which event the deposit would be returned and the rights of all parties cease. It further provided that Padula should be allowed to pay over the $10,000 received as the deposit to Bond and Mortgage Company of New Jersey, described as the "seller under a certain contract of sale entered into by Samuel J. Padula and Bankers Bond and Mortgage for the sale of the within premises". In fact, as known to Mihranian, Padula had not yet signed a formal contract with Bond and Mortgage to purchase the property and, at the time of the contract with Mihranian, Padula therefore had neither legal title to the premises nor equitable ownership thereof.
A week later, on May 5, 1971, Padula did enter into a contract with Bond and Mortgage for the purchase of the premises. Although it provided for the obtaining of subdivision approval by Bond and Mortgage, no time limit for securing the same was specified and the contract, unlike that between Padula and Mihranian, was not conditional. Bond and Mortgage received the $10,000 paid by Mihranian to Padula. It was stipulated that Bond and Mortgage did not then have actual knowledge of the contract between Padula and Mihranian or of the source of the deposit.
At about this time Mihranian, which apparently also signed a contract with Padula on or about April 30, 1971 *561 for the purchase of Section 1, Brookside Estates, consisting of 15 prospective lots, signed an addendum thereto which provided that a $10,000 deposit made on the purchase of Section 1 should be deemed reallocated so that the down-payment on Section 1 should be only $5,000 and the remaining $5,000 should be considered an additional down-payment on the purchase of Section 2. The deposit on the latter contract was therefore increased from $10,000 to $15,000. There is no indication that this extra $5,000 was paid over to Bond and Mortgage.
Padula failed to get subdivision approval within six months. On November 3, 1971 Mihranian elected to terminate the contract and demanded the return of the $15,000 deposit, as it was entitled to do. On December 21, 1971 it commenced action in two counts against Padula and Bond and Mortgage for recovery of the deposit and establishment of a vendee's lien on the premises in question. Lis pendens was filed on December 28, 1971.
Legal title to the premises never became vested in Padula but it was conveyed to his assignee. Sometime after the institution of the above suit and the filing of the lis pendens, Padula assigned his rights under his contract with Bond and Mortgage to Villa Madrid, Inc. and there was a closing on this assignment on April 13, 1972. The consideration paid for the assignment is not set forth in the stipulation of the parties nor is a copy of the assignment reproduced in the appendix. On May 8, 1972 Villa Madrid closed with Bond and Mortgage, receiving a deed conveying to it legal title to the premises and, in connection therewith, it was given a $10,000 credit on the purchase price by Bond and Mortgage  obviously because of the original deposit made by Padula from Mihranian's funds.
On or about July 14, 1972 Mihranian filed a supplemental complaint adding Villa Madrid as a party defendant to its action seeking return of its deposit and enforcement of a vendee's lien against the premises.
*562 It seems clear from the stipulation and arguments of the parties that Villa Madrid did not have actual notice when it closed with Bond and Mortgage of Mihranian's claim for a vendee's lien or of the actual source of the deposit for which it received credit at closing. Both Bond and Mortgage and Villa Madrid filed third-party complaints against their title companies and the latter companies joined in the proceedings before the trial judge. Although those pleadings are not included in the record on appeal and the defenses and claims of the title companies are not before us or material to our decision, the companies in effect acknowledged that they had negligently overlooked the lis pendens in their searches.
Mihranian claimed below that it had a valid vendee's lien and that it was enforceable against the land in Villa Madrid's hands. Bond and Mortgage, Villa Madrid and the two title companies asserted, among other things, that the lien was never valid because Padula never acquired legal title. With the acquiescence of the parties, the trial judge first entered an in personam judgment for $15,000 against Padula and adjourned to a subsequent date the determination of the other issues, including the validity of the vendee's lien claim. On the adjourned date, after hearing argument, he ruled that Mihranian dd not have a valid vendee's lien, saying:
The lien  this is the way I am going to rule, and I appreciate that it is complicated and there are some factors that are obscure, but as I see it, the contract if Mihranian can get anywhere he has to have me consider Padula was the vendor under this equitable claim and at the time, April 30, 1971, when the contract was entered into and presumably the $10,000.00 was paid, later supplemented by five more, Padula had no contract, he had no title, he had no interest and he didn't even have an equitable title or an equitable claim arising out of a contract with Bond and Mortgage, the title holder. That contract only came into being later. Mihranian, on top of it, knew that Padula didn't have title. I don't know whether they knew whether he had equitable title or not but they knew he had no title whatsoever and therefore I am going to find that no equitable lien attached to the land on the 30th of April, 1971 or at any time thereafter *563 arising out of the Padula contract to Mihranian because Padula had no interest upon which the lien could attach. The lien has to attach onto something that Padula owned.
This ruling rendered all other unresolved issues between the parties moot. A judgment was entered denying relief on the lien claim. Mihranian appeals.
We are satisfied that the trial judge erred and we reverse.
The vendee's lien is of ancient origin and it has been recognized and enforced in this State since at least 1830. Copper v. Wells, 1 N.J. Eq. 10 (Ch. 1830); see Reilly v. Griffith, 141 N.J. Eq. 154, 165 (Ch. 1947), aff'd 142 N.J. Eq. 724 (E. & A. 1948). It is frequently referred to as the counterpart to the vendor's lien and, although courts elsewhere are not in entire accord as to the sources and reasons for its existence, it is enforced in most other jurisdictions in this country. As stated in 10A Thompson on Real Property § 5271 at 572 (1957):
Whether the foundation of this lien is natural equity, imputed intention, partial ownership, the implication of a trust, or a blending of some of these sources, the authorities, almost without exception in those jurisdictions which give a lien to the vendor, are clear that one exists.
Our courts, in affirming the existence and validity of vendees' liens, generally refer to the maxim that equity regards as done that which ought to be done, to the doctrine of equitable conversion which is firmly entrenched in our jurisprudence, and to the trust relationship which arises between the parties upon the execution of a contract of sale of realty. When such contract is entered into, in the eyes of equity the contract is regarded for most purposes as though specifically executed and the original estate of each of the parties is regarded as "converted". The vendee becomes the equitable owner of the land and the vendor of the purchase money, and the vendor is considered the trustee of his estate in the land for the vendee. When the vendee *564 pays a portion of the purchase money, the vendor becomes a trustee for him and the vendee acquires a lien just as if the vendor had executed a mortgage to him of his estate to the extent of the payment received. See Craft v. Latourette, 62 N.J. Eq. 206 (Ch. 1901); Richeimer v. Fischbein, 107 N.J. Eq. 493 (E. & A. 1931), rev'g. 105 N.J. Eq. 627 (Ch. 1930); Rutherford Nat. Bank v. H.R. Bogle & Co., 114 N.J. Eq. 571 (Ch. 1933); Reilly v. Griffith, supra; Plainfield Courier News Co. v. Hollander, 93 N.J. Super. 442 (Ch. Div. 1967). As stated in the latter case, quoting with approval from 3 American Law of Property, § 1178 at 195-196:
* * * Such lien, in England and in most American jurisdictions, is bestowed upon the purchaser even in the absence of any special equities in his favor, such as possession or improvements made by him, on the theory that with each payment the purchaser performs pro tanto and is thereby equitably vested with a ratable portion of the estate. If the vendor cannot convey, the purchaser, as equitable owner, pro tanto, may assert his rights in a court of equity to recover any payments made. If the vendor is not the absolute owner, the purchaser's lien attaches only to the extent of the vendor's interest, which may be converted into money by judicial sale  a remedy which is, in effect, the same as the foreclosure of an equitable mortgage. * * * [93 N.J. Super. at 444]
See, generally, Annotations, "Right of vendee under executory land contract to lien for amount paid on purchase price", 45 A.L.R. 352 (1926) and 33 A.L.R.2d 1384 (1954); Annotations, "Vendee's right to recover amount paid under executory contract for sale of land", 59 A.L.R. 189, 233 et seq. (1929) and 134 A.L.R. 1064, 1081 (1941); 53 C.J.S., Liens, § 7b at 852; 77 Am. Jur.2d, Vendor and Purchaser, §§ 512-516 at 639-644; 4 Pomeroy's Equity Jurisprudence (5 ed.), § 1263 at 773-776.
It is, of course, true that in the usual case the vendor has legal title at the time he enters into the contract of sale and there is no problem of an insufficient estate to which the vendee's lien may attach. However, the courts everywhere, applying the basic underlying policy reasons *565 which gave rise to vendee's liens in the first instance, have been liberal in fashioning rules to protect the vendee's interests. Thus it is well settled that a lien exists not only where the vendor is at fault for breach of the contract but also where, as here, it is rescinded under a condition entitling the vendee to rescind. Reilly v. Griffith, supra. Although there is nothing to which the lien can attach if the vendor has never at any time had an interest in the land, see Jarman v. Kleeberg, 102 Fla. 563, 136 So. 448 (Sup. Ct. 1931); Annotation, supra, 33 A.L.R.2d at 1386, it is not fatal to its existence that the vendor had no interest when the contract was entered into so long as he subsequently acquires an interest. Equity considers the property dedicated to the promised use, and as soon as the vendor acquires an interest in the land the vendee's lien immediately becomes affixed and attached thereto, and this is so even though the vendee's deposits on the purchase price were made prior to the vendor's acquiring his interest. Our courts have so held where the interest subsequently acquired by the vendor is legal title. Rutherford Nat. Bank v. H.R. Bogle & Co., supra; Tancred v. Beppler, 15 N.J. Super. 394 (Ch. Div. 1951). Although the direct authority in point is sparse, the rationale of the above cases and the basic reasons for enforcing vendee's liens apply equally well where the interest acquired is equitable ownership. Such ruling was made in Elterman v. Hyman, 192 N.Y. 113, 84 N.E. 937, 942 (Ct. App. 1908), where the vendor had only equitable title pursuant to a contract to buy the land which he had agreed to sell to plaintiff, and the court said, "If the vendor is not the absolute owner, the lien of the vendee `exists only to the extent of the vendor's interest,' which in this case is only that of a subpurchaser." See also, Elterman v. Hyman, 141 App. Div. 208, 126 N.Y.S. 6, 11 (App. Div. 1910); Harding v. Burke, 205 App. Div. 597, 200 N.Y.S. 144 (App. Div. 1923); see Wayne B. & L. Co. of Wooster v. Yarborough, 11 Ohio St.2d 195, 228 N.E.2d 841 (Sup. *566 Ct. 1967); see Temple v. Clinton Trust Co., 1 N.J. 219, 226 (1948); 51 Am. Jur.2d, Liens, § 17 at 156. And see, Reilly v. Griffith, supra, where it was held that when it was impossible to enforce a vendee's lien against the whole title to lands involved in the transaction which gave rise to the vendee's lien, because the vendor had sold the lands to a subsequent bona fide purchaser, the lien would be impressed on any interest retained by the vendor and would attach to a purchase money mortgage retained by the vendor. Vice-Chancellor Woodruff said, "While relief in this exact form seems never to have been sought of this court, or granted by it, I have no hesitation in advising it. Every consideration of conscience and of justice requires such action * * *." 141 N.J. Eq. at 169.
Here Padula had no interest in the land when the contract was signed with Mihranian and the latter made its down-payment. A week later Padula acquired equitable ownership by virtue of his contract to buy from Bond and Mortgage. Mihranian's vendee's lien attached immediately to his interest. When Mihranian rescinded and commenced action to enforce its equitable lien, it filed a proper lis pendens which clearly had the effect of giving notice to subsequent purchasers of Padula's interests of the claim to the lien in the lands in question. See N.J.S.A. 2A:15-6 et seq. Villa Madrid was bound by such lis pendens and took title subject to Mihranian's claim of lien. Mihranian's equitable lien may be enforced out of the land. To hold otherwise would permit persons like Padula dealing in real estate to avoid vendee's liens by simply assigning their rights to others and not taking legal title. Such result offends every consideration of conscience and justice.
We conclude that Mihranian had a valid vendee's lien for the payments made by it on account of the purchase price of the lands, and we reverse for further proceedings in accordance with this opinion. We express no opinion as to the rights of the respondents inter sese, those issues *567 having been rendered moot by the decision of the trial judge and not presented to us on this appeal. We do not retain jurisdiction.