753 A.2d 1112

HARRY W. COX AND BETTY ELIZABETH ANN COX, HIS WIFE, PLAINTIFFS–RESPONDENTS, v. RKA CORPORATION AND RICHARD NIEL, JOINTLY, SEVERALLY, AND IN THE ALTERNATIVE, DEFENDANTS,ROEBLING SAVINGS AND LOAN ASSOCIATION, DEFENDANT–APPELLANT.

Argued October 25, 1999—Decided June 30, 2000.

488

*Joseph F. Polino* argued the cause for appellant (*Mr. Polino* and *Ernest A. Ferri,* attorneys).

*F. Michael Daily, Jr.* argued the cause for respondents (*Quinlan, Dunne & Daily,* attorneys; Mr. Daily and Patricia M. Nigro, on the briefs).

*Joseph M. Clayton, Jr.* submitted a letter brief on behalf of *amicus curiae*, New Jersey Land Title Association.

The opinion of the Court was delivered by

VERNIERO, J.

Plaintiffs instituted this action to compel specific performance of a building contract involving construction of a new home. Their complaint, as amended, also seeks to void defendant's mortgage interest in the same parcel or, alternatively, to impress a superior lien on the property for the money that they had advanced toward the purchase price. As contract purchasers of real property, plaintiffs acquired a vendees' lien on the property. We must determine the extent to which that unrecorded vendees' lien should be granted priority over defendant's recorded mortgage that was given to finance the home construction.

We hold that the priority of an unrecorded vendee's lien does not extend to those payments voluntarily made by the vendee after the lender properly records its mortgage. However, because the issue is essentially one of first impression in New Jersey, we decline to apply our holding to the present dispute. In view of the uncertainty of the law at the time of these transactions, we conclude that plaintiffs' vendees' lien should be given priority as against defendant's mortgage interest for the full amount of their initial deposit, and all sums later advanced toward the contract price.

I.

Harry and Betty Ann Cox executed a standard-form contract with RKA Corporation (RKA) for the purchase of real estate located in Pennsauken, New Jersey (the property). Under the contract, RKA was to construct a new home for plaintiffs on the property. The purchase price was $106,880. Plaintiffs paid an initial deposit of $12,000 to RKA on August 25, 1994, the date they signed the contract. The contract specified that the balance of the purchase price would be due "at settlement." The settlement date

was originally scheduled for October 31, 1994 but the parties understood that the closing would not occur until plaintiffs sold their existing home. Plaintiffs were not represented by an attorney in this transaction.

Unbeknownst to plaintiffs, RKA then sought a construction loan from Roebling Savings and Loan Association (Roebling) in the amount of $80,250. When it applied for the construction loan, RKA supplied Roebling with a copy of the contract entered into with plaintiffs. The fact that the property was under contract or "pre-sold" to plaintiffs was a factor considered by Roebling in granting the loan. Roebling was never in communication or contact with plaintiffs regarding the project.

On October 21, 1994, RKA settled the construction loan with Roebling, which took back a mortgage on the property as security for the loan. At that time, RKA's principal, Richard Niel, executed an affidavit of title certifying that "no other persons have legal rights in this property." Roebling paid RKA an initial advance on the loan in the amount of $43,335. On December 12, 1994, Roebling made a second advance to RKA in the amount of $30,896. The lender duly recorded its mortgage in the Office of the Register of Deeds of Camden County on December 14, 1994.

Following the recording of Roebling's mortgage, plaintiffs made a series of payments to RKA towards the balance of the purchase price: $2,267 on January 3, 1995; $2,000 on March 15, 1995; $3,000 on June 15, 1995; $2,000 on July 28, 1995; and $61,958.53 on August 3, 1995. None of the payments was due on those dates. As noted, the contract did not require any payment beyond the initial deposit until the date of settlement. In total, plaintiffs paid RKA $83,225.53 prior to the settlement date (the $12,000 deposit and $71,225.53 in additional advances). Plaintiffs and RKA never closed title.

On or about November 28, 1995, the Coxes commenced this action for specific performance against RKA. RKA defaulted on the construction loan from Roebling, and the lender took steps to foreclose its mortgage. Plaintiffs amended their complaint to

name Richard Niel as a defendant and to allege breach of contract, misapplication of trust funds, actual fraud, and consumer fraud. In a second amendment, plaintiffs named Roebling as a defendant and sought to void the Roebling mortgage or, in the alternative, to impress a superior lien on the property for all monies that they had advanced to RKA.

A default judgment was entered against RKA and Richard Niel in the amount of $83,225.53 for breach of contract and $249,676.59 for treble damages under the Consumer Fraud Act, *N.J.S.A.* 56:8–19. In respect of Roebling's mortgage, the trial court concluded, after a bench trial, that Roebling had taken its mortgage with knowledge of plaintiffs' interest in the property. Specifically, the court determined that plaintiffs' equitable interest, including the $12,000 deposit and all monies paid to RKA, constituted a lien superior to Roebling's recorded mortgage. In all other respects the court sustained the validity of Roebling's mortgage.

In an unreported opinion, the Appellate Division affirmed. In support of its disposition, the court relied on the fact that, as previously noted, Niel's October 21, 1994, affidavit declared "no other persons have legal rights in the property." According to the Appellate Division:

> [That affidavit] constituted a lie under oath by Niel which Roebling was aware of because it knew of the Cox contract.
>
> We think the trial judge correctly concluded that, given its knowledge of the Coxes' interest in the property, Roebling should have made further inquiry at that time.... [I]f Roebling had made inquiry of the Coxes or even copied them with the false affidavit, the Coxes would have been on notice of Roebling's interest in the transaction and would never have continued to advance the additional [monies]. This is not to suggest that Roebling was an evildoer, only that its inaction in the face of Niel's mendacity which caused catastrophe to the Coxes is an "unusual equity" which warrants striking the balance, otherwise in equipoise, in favor of the Coxes.

One member of the panel, Judge Carchman, dissented, concluding that the quantum of plaintiffs' relief should be limited to the amount of their initial deposit. Roebling appeals to this Court as of right. *R.* 2:2-1(a)(2).

## II.

The resolution of this dispute turns on the interplay among certain equitable principles and the policy undergirding New Jersey's recording statutes, *N.J.S.A.* 46:15–1 to 46:26–1. We begin with the equitable principles, the most important of which concerns the common-law concept of the vendee's lien.

New Jersey has recognized and enforced the notion of a vendee's lien at least as far back as 1830. *Copper v. Wells*, 1 *N.J. Eq.* 10 (Ch. 1830) (finding complainant's claim for permanent and valuable improvements made to land following agreement of sale is a lien in equity on property).

> Our courts, in affirming the existence and validity of vendees' liens, generally refer to ... the trust relationship which arises between the parties upon the execution of a contract of sale of realty. When such contract is entered into, in the eyes of equity the contract is regarded for most purposes as though specifically executed and the original estate of each of the parties is regarded as "converted." The vendee becomes the equitable owner of the land and the vendor of the purchase money, and the vendor is considered the trustee of his estate in the land for the vendee. When the vendee pays a portion of the purchase money, the vendor becomes a trustee for him and the vendee acquires a lien just as if the vendor had executed a mortgage to him of his estate to the extent of the payment received.
>
> [*Mihranian, Inc. v. Padula*, 134 *N.J.Super.* 557, 563–64, 342 *A.*2d 523 (App.Div. 1975) (citations omitted), *aff'd*, 70 *N.J.* 252, 359 *A.*2d 473 (1976).]

The vendee's lien arises only " 'when the vendor is in some default for not completing the contract according to its terms, and the vendee is not in default so as to prevent him [or her] from recovering the purchase-money paid.' " *Reilly v. Griffith*, 141 *N.J. Eq.* 154, 164, 56 *A.*2d 502 (Ch.1947) (quoting 4 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 1263, at 775 (5th ed.1941)), *aff'd o.b.*, 142 *N.J. Eq.* 724, 61 *A.*2d 235 (E. & A.1948). The purchaser is granted a vendee's lien "on the theory that 'with each payment, the purchaser performs *pro tanto* [for so much] and is thereby equitably vested with a ratable portion of the estate.' " *Mihranian, supra*, 134 *N.J.Super.* at 564, 342 *A.*2d 523 (quoting 3 *American Law of Property* § 11.78, at 195–96 (1952)); *Black's Law Dictionary* 1100 (5th ed.1979).

In the event the vendor cannot properly convey title, "the purchaser, as the equitable owner, *pro tanto,* may assert his [or her] rights in a court of equity to recover any payments made." *Mihranian, supra,* 134 *N.J.Super.* at 564, 342 *A.*2d 523 (internal quotation marks omitted). "If the vendor is not the absolute owner, the purchaser's lien attaches only to the extent of the vendor's interest, which may be converted into money by judicial sale[.]" *Ibid.* (internal quotation marks omitted).

Related to the concept of the vendee's lien is that of equitable conversion, a judicially-created doctrine "adopted for the purpose of giving effect to the intention of ... contracting parties." 27A *Am.Jur.2d Equitable Conversion* § 1, at 483 (1996); *Jacobs v. Great Pac. Century Corp.,* 197 *N.J.Super.* 378, 484 *A.*2d 1312 (Law Div.1984), *aff'd,* 204 *N.J.Super.* 605, 499 *A.*2d 1023 (App.Div.1985), *aff'd,* 104 *N.J.* 580, 518 *A.*2d 223 (1986). Succinctly stated, the doctrine of equitable conversion

> is not a fixed rule of law but proceeds on equitable principles that take into account the result to be accomplished. It is a mere fiction, resting on the principle that equity regards things which are directed to be done as having actually been done where nothing has intervened which ought to prevent performance. It merely means that where there is a mandate to sell real property at a future date or to employ money for the purchase of land, the property will be considered in equity as that species of property into which it is directed to be converted.
>
> [27A *Am.Jur.*2d *Equitable Conversion* § 1, at 483–84 (footnotes omitted).]

Although the purchaser may be deemed to be vested with a certain equitable interest, the doctrine of equitable conversion does not extinguish the seller's legal title in the property. 27A *Am.Jur.*2d *Equitable Conversion* § 13, at 496. "The seller's position is analogous to that of the mortgagee who retains legal title as security for the purchase price. The vendor has an interest that he or she can sell or mortgage that is measured by the amount the buyer owes under the contract." *Ibid.* (footnotes omitted).

Against that common-law backdrop, the Legislature has enacted New Jersey's recording statutes. *N.J.S.A.* 46:21–1 provides, in pertinent part, that

whenever any deed or instrument ... which shall have been or shall be duly
acknowledged or proved and certified, shall have been or shall be duly recorded or
lodged for record with the county recording officer of the county in which the real
estate or other property affected thereby is situate or located such record shall,
from that time, be notice to all subsequent judgment creditors, purchasers and
mortgagees of the execution of the deed or instrument so recorded and the
contents thereof.

Additionally, *N.J.S.A.* 46:22–1 provides that

[e]very deed or instrument ... shall, until duly recorded or lodged for record in
the office of the county recording officer in which the affected real estate or other
property is situate, be void and of no effect against subsequent judgment creditors
without notice, and against all subsequent bona fide purchasers and mortgagees for
valuable consideration, not having notice thereof, whose deed shall have been first
duly recorded or whose mortgage shall have been first duly recorded or registered;
but any such deed or instrument shall be valid and operative, although not
recorded, except as against such subsequent judgment creditors, purchasers and
mortgagees.

By those enactments, New Jersey is considered a "race-notice" jurisdiction, which means that as between two competing parties the interest of the party who first records the instrument will prevail so long as that party had no actual knowledge of the other party's previously-acquired interest. *Palamarg Realty Co. v. Rehac,* 80 *N.J.* 446, 454, 404 *A.2d* 21 (1979). As a corollary to that rule, parties are generally charged with constructive notice of instruments that are properly recorded. *Friendship Manor, Inc. v. Greiman,* 244 *N.J.Super.* 104, 108, 581 *A.2d* 893 (App.Div.1990) ("In the context of the race notice statute, constructive notice arises from the obligation of a claimant of a property interest to make reasonable and diligent inquiry as to existing claims or rights in and to real estate."), *certif. denied,* 126 *N.J.* 321, 598 *A.2d* 881 (1991).

This Court has recognized the underlying purpose of the recording statutes:

"An historical study of the [Recording] Act, as well as an analysis of the cases
interpreting it, leads to the conclusion that it was designed to compel the recording
of instruments affecting title, for the ultimate purpose of permitting purchasers to
rely upon the record title and to purchase and hold title to lands within this state
with confidence. The means by which the compulsion to record is accomplished is
by favoring a recording purchaser, both by empowering him to divest a former
non-recording title owner and by preventing a subsequent purchaser from divest-

ing him of title. This ability to deprive a prior bona fide purchaser for value of his property shows a genuine favoritism toward a recording purchaser. It is a clear mandate that the recording purchaser be given every consideration permitted by the law, including all favorable presumptions of law and fact. It is likewise a clear expression that a purchaser be able to rely upon the record title."

[*Palamarg, supra,* 80 *N.J.* at 453, 404 *A.*2d 21 (quoting Donald B. Jones, *The New Jersey Recording Act—A Study of its Policy,* 12 *Rutgers L.Rev.* 328, 329–30 (1957)).]

Courts have thus held that the integrity of the recording scheme is paramount. " '[A]bsent any unusual equity' the stability of titles and conveyancing requires the judiciary to follow that course 'that will best support and maintain the integrity of the recording system.' " *Friendship Manor, supra,* 244 *N.J.Super.* at 113, 581 *A.*2d 893 (quoting *Palamarg, supra,* 80 *N.J.* at 453, 404 *A.*2d 21).

### III.

With those principles and statutes in mind, we must now determine whether and to what extent plaintiffs may recover their expended funds. That plaintiffs are entitled to a vendees' lien for monies paid to RKA is plain. Plaintiffs' payments, seemingly made in good faith, entitle them to be equitably vested with a ratable portion of the estate. *Mihranian, supra,* 134 *N.J.Super.* at 564, 342 *A.*2d 523. Our law is clear and settled on that point.

What is not so clear is how to determine the priority or value of plaintiffs' lien *vis-a-vis* Roebling's recorded mortgage. Jurisdictions are not uniform in their approach to that question and we have found no reported New Jersey case addressing the issue precisely. *See generally* John P. Ludington, Annotation, *Right of Vendee Under Executory Land Contract to Lien for Amount Paid on Purchase Price as Against Subsequent Creditors of or Purchasers from Vendor,* 82 *A.L.R.*3d 1040 (1978).

In *Mihranian, supra,* 134 *N.J.Super.* at 560, 342 *A.*2d 523, the plaintiff entered into a written contract with the defendant, Samuel J. Padula (Padula), for the sale of land in Dover Township, New Jersey. At the time of the contract, the plaintiff made an initial deposit of $10,000. Pursuant to the contract Padula was required to obtain subdivision approval of several lots on the property

within a specified time period. Failure by Padula to obtain the subdivision approval would render the contract null and void, in which event the plaintiff's deposit would be returned. *Ibid.* Padula did not have legal or equitable ownership of the property when he executed the contract with the plaintiff. *Ibid.* The parties contemplated that Padula was going to enter into a contract with Bond and Mortgage Company of New Jersey (Bond and Mortgage) for the purchase of the property. To facilitate Padula's purchase of the property, the contract between Padula and the plaintiff provided that Padula could pay the plaintiff's $10,000 deposit over to Bond and Mortgage. *Ibid.*

Padula did enter into the contract with Bond and Mortgage and paid over the initial $10,000 deposit that he received from the plaintiff. At about the same time, the plaintiff signed an addendum and increased the deposit by $5,000 for a total of $15,000. *Id.* at 561, 342 *A.*2d 523. The additional $5,000 was not paid over to Bond and Mortgage.

Padula failed to get the subdivision approval and the plaintiff elected to terminate the contract. Thereafter, the plaintiff commenced an action against Padula and Bond and Mortgage seeking to recover the full $15,000 deposit and to establish a vendee's lien on the premises. Along with the complaint, the plaintiff filed a *lis pendens. Ibid.*

Subsequent to the filing of the plaintiff's complaint, Padula assigned his rights under his contract with Bond and Mortgage to a third party, Villa Madrid, Inc. (Villa Madrid). Villa Madrid closed on the property with Bond and Mortgage and obtained legal title to the subject property through a deed. A $10,000 credit on the purchase price was given to Villa Madrid because of the original deposit made by Padula from the plaintiff's funds. *Ibid.*

The Appellate Division found that Villa Madrid took the property subject to the plaintiff's vendee's lien in the amount of $15,000. *Id.* at 566, 342 *A.*2d 523. The court held that the plaintiff had a valid vendee's lien for the payments it made toward the purchase

price of the land and that Villa Madrid took title subject to that lien. *Ibid.* The court placed primary importance on the fact that the *lis pendens* placed other parties on constructive notice of the plaintiff's lien claim. Thus, although the *Mihranian* court upheld the vendee's lien against a subsequent party, it did so because the vendee in that case filed a *lis pendens* providing notice to the full extent of the vendee's payments. *See also* 4B *New Jersey Practice, Civil Forms* § 105.2, at 436 (James H. Walzer) (1998) (stating that once *lis pendens* is filed, it serves as notice to "any person claiming an interest or lien upon the lands through any defendant in the suit").

Other jurisdictions have similarly found that a vendee's lien has priority over a third party's mortgage interest to the extent that the third party has notice of the value of the vendee's equity in the property. Two cases in particular resemble the present dispute.

The first is *Stanovsky v. Group Enter. & Constr. Co.*, 714 *S.W.*2d 836, 837 (Mo.Ct.App.1986). There, the plaintiffs entered into a contract with a home builder for the purchase of property and construction of a home. The plaintiffs paid a deposit of $12,300. The builder applied to the lender for a construction loan of $84,000. Attached to the loan application was the contract executed by the plaintiffs and the builder. *Ibid.*

The lender approved the loan and recorded its mortgage interest. *Ibid.* The builder failed to complete construction and the final closing on the property was aborted as a result of the lender's initiation of foreclosure proceedings. The lender purchased the property at the foreclosure sale and recorded its interest. The plaintiffs contended that, as a matter of law, they were entitled to an equitable vendee's lien against the real estate, superior to the lender's lien. *Id.* at 838.

The court held that the plaintiffs had a valid vendee's lien on the property for the amount of earnest money they paid toward the purchase price of the property, namely $12,300. *Id.* at 839. In reaching its decision, the court found the lender had notice of the plaintiffs' interest because, as part of the loan application, the

builder provided the lender with the plaintiffs' contract, which revealed the payment of the earnest money. *Id.* at 838–39. In those circumstances, the court found the lender had notice of the plaintiffs' inchoate lien interest at the time it granted the construction loan.

In the second case, *Stahl v. Roulhac*, 50 *Md.App.* 382, 438 *A.*2d 1366, 1367 (1982), the plaintiffs executed an agreement of sale with a home builder for the purchase of property and construction of a home for $110,000. At the time they entered into the contract, the plaintiffs made a down payment of $10,100; the balance of the purchase price was due at the time of settlement. *Ibid.* At the time of the agreement, the property was subject to a first mortgage executed by the builder to a lender to secure a land-acquisition loan. *Ibid.*

Subsequent to the agreement, the builder executed a second mortgage to the same lender to obtain a construction loan. The lender took that second mortgage with knowledge of the agreement between the builder and the plaintiffs. The lender based its loan decision on the existence of the contract and the loan commitment forms. The builder defaulted on the loan prior to the completion of the plaintiffs' home. That default resulted in a foreclosure sale of the property. *Ibid.*

The proceeds from the sale satisfied the lender's first recorded interest and yielded a surplus in the amount $101,781. The plaintiffs claimed they had a valid vendees' lien that had priority over the lender's second recorded mortgage, and that they were entitled to the amount of their deposit as well as amounts they had expended toward the completion of the project. In addition to the $10,100 deposit, the plaintiffs had used their own funds for the construction of the driveway and other items. All totaled, the plaintiffs had expended $45,629.89 to advance the project, including the initial deposit. *Id.* at 1367–68.

The court held that the plaintiffs' lien had priority to the extent of their initial deposit, but that the lender had a priority lien for the remaining sums by virtue of its recorded mortgage. *Id.* at

1369. The court concluded that the "known equities" when the lender granted the builder the construction loan consisted of the plaintiffs' deposit only. That amount, $10,100, was stated in the contract. *Ibid.* The court reasoned:

[The lender] was under no obligation in determining "known equities" to seek out the purchasers to determine if any private agreements had been negotiated between the seller and purchaser, *or if the contract purchaser had voluntarily expended sums not provided for in the contract.*

[*Ibid.* (emphasis added).]

*See also Tile House, Inc. v. Cumberland Fed. Sav. Bank,* 942 *S.W.*2d 904 (Ky.1997) (holding that purchasers under land sale contract had vendee's lien for deposits made, which had priority over mortgage interest of bank under construction loan because bank had copies of contract thereby placing it on notice of payments made by purchasers).

In the present case, as in *Stahl* and *Stanovsky,* Roebling had actual notice of the $12,000 deposit paid by the Coxes toward the purchase price when it granted RKA its construction loan and recorded its mortgage. RKA supplied Roebling with the contract between itself and the Coxes that stated the deposit amount paid by the Coxes and the amount due at closing. Based on those facts, we conclude that plaintiffs' vendees' lien in the amount of the $12,000 deposit should have priority over Roebling's later-recorded mortgage interest. Prior case law and basic fairness compel that equitable result.

In respect of the advances voluntarily made by the Coxes subsequent to Roebling's mortgage interest, the record indicates that Roebling had neither actual nor constructive notice of those intended payments at the time the lender recorded its mortgage. Stated differently, the known equity of plaintiffs chargeable to Roebling was the amount stated in the contract, namely the $12,000. The lender knew of no other payments or advances to RKA intended by plaintiffs as none was required by the parties' agreement.

Conversely, the Coxes had constructive notice of Roebling's mortgage interest prior to making their advances to RKA because Roebling properly recorded the mortgage instrument. *N.J.S.A.* 46:21–1; *N.J.S.A.* 46:22–1; *Lincoln Fed. Sav. and Loan Assoc. v. Platt Homes, Inc.,* 185 *N.J.Super.* 457, 465, 449 *A.*2d 553 (Ch.Div.1982). As Judge Carchman noted in his dissenting opinion: "To suggest that the mortgage recording, under the facts presented here, was of no equitable or legal significance, deprecates a system which is essential to the integrity of titles and land transactions."

The effect of constructive notice on lien priority was addressed, albeit in a different context, in *Lincoln, supra.* There, defendant Platt Homes, Inc. (Platt) was the owner of several lots that it planned to develop. In January 1979, defendant Hedges loaned Platt $20,000 in return for forty percent of the profits of the development of one of the lots. In May 1979, Platt obtained a construction loan from Lincoln Federal Savings & Loan Association (Lincoln) for the same lot in respect of which Hedges had obtained an interest. *Lincoln, supra,* 185 *N.J.Super.* at 459, 449 *A.*2d 553.

The loan agreement provided for discretionary advances by Lincoln up to $94,500. Lincoln recorded its mortgage and made an initial advance to Platt in the amount of $39,500. *Ibid.* On July 26, 1979, after Lincoln recorded its mortgage, Hedges loaned Platt an additional $10,000 and their earlier agreement was altered to reflect a $40,000 mortgage from Platt to Hedges that was recorded on July 30, 1979. *Ibid.* Although Hedges loaned Platt only $30,000, $40,000 was to be repaid because Hedges relinquished his share of the profits and agreed not to charge Platt a fixed interest rate. *Ibid.*

Lincoln then made a discretionary, second advance to Platt in the amount of $27,200. Although Lincoln conducted a title search before making the second advance, the search failed to reveal Hedges's intervening lien. Platt defaulted on both mortgages and a dispute arose concerning the priorities of the liens held by

Hedges and Lincoln. Hedges conceded that the initial advance of $39,500 by Lincoln had priority, but contended that his intervening mortgage was superior to the extent of Lincoln's second advance of $27,200. *Ibid.* The court concluded that Lincoln's lien on the property applied only to the extent of monies actually advanced pursuant to the terms of the mortgage, and not in respect of the face amount of the mortgage. *Id.* at 460, 449 *A.*2d 553.

The court also addressed whether Hedges's recorded mortgage had priority over Lincoln's lien for the optional advances made by Lincoln after it had constructive notice of Hedges's intervening lien. *Id.* at 463, 449 *A.*2d 553. The court considered the provisions of the recording statutes and found that Lincoln was charged with constructive notice of Hedges's mortgage from the time it was recorded. *Id.* at 464–65, 449 *A.*2d 553. The court thus concluded that, "Lincoln made its second construction advance at its peril." *Id.* at 465, 449 *A.*2d 553.

For purposes of resolving the lien conflict, the court placed constructive notice of an instrument on a par with actual notice; it also relied on the public policy supporting strict enforcement of the recording statutes. *Id.* at 465–66, 449 *A.*2d 553. In view of that policy, the court held that "constructive notice of intervening liens is sufficient to defeat the priority position of a construction mortgagee as to optional future advances." *Id.* at 466–67, 449 *A.*2d 553; *see also In Re Mayfair Constr. Co.,* 170 *F.Supp.* 657 (D.N.J.1959) (finding that equitable liens of purchasers who entered into contracts with bankrupt developer and did not record such contracts were inferior to liens of mortgagees who recorded their mortgages without notice of purchasers' contracts).

Like the mortgagee in *Lincoln,* the Coxes made voluntary advances, in addition to their initial deposit, toward the purchase price of the property after Roebling granted the construction loan to RKA and recorded its mortgage. Indeed, the Coxes are analogous to mortgagees because as vendees under the common law, they "acquire[d] a lien just as if the vendor had executed a mortgage to [them] of his estate to the extent of the payment

received." *Mihranian, supra,* 134 *N.J.Super.* at 564, 342 *A.2d* 523. Plaintiffs were therefore charged with constructive notice of Roebling's recorded mortgage. We note that a title search, conducted by a title search company or an attorney, would have revealed Roebling's interest in the property. Vendees who voluntarily advance payments after notice of an intervening interest must be viewed, like the mortgagee in *Lincoln,* as having made such payments at their peril.

In contrast, the advances made by the Coxes were unrecorded, and Roebling had no notice, actual or constructive, of those intended advances. Any search by Roebling of the public records for those interests would have been fruitless (indeed the payments had not yet materialized at the time Roebling had acquired its mortgage).

Nor did Niel's affidavit serve as notice to Roebling that plaintiffs might advance funds prematurely. From the lender's perspective, it had in hand two documents, a copy of the Coxes' contract and an affidavit purportedly representing that the property was clear of all liens. In harmonizing those documents, Roebling may have believed that the representations contained in the affidavit were subject to the known equities expressed in the contract (*i.e.,* the $12,000 deposit). Even if we assume, as did the Appellate Division, that Niel's affidavit constituted a "lie under oath," there is nothing in that affidavit that would have caused Roebling to believe that plaintiffs would accelerate their payments beyond the requirements of the contract.

Some jurisdictions have held that the vendee may recover his or her deposit monies whenever "the subsequent lender knows a contract has been executed, whether or not it is aware of the terms of the contract, the vendee's identity, or the precise amount of any down payment made." 2 Grant S. Nelson & Dale A. Whitman, *Real Estate Finance Law* § 13.3, at 286 n. 18 (3d ed.1993) (citing *Wayne Bldg. & Loan Co. v. Yarborough,* 11 *Ohio St.2d* 195, 228 *N.E.2d* 841 (1967); *Palmer v. Crews Lumber Co.,* 510 *P.2d* 269 (Okla.1973); *South Carolina Fed. Sav. Bank v. San–*

*A–Bel Corp.,* 307 *S.C.* 76, 413 *S.E.*2d 852 (1992)). By extension, it is possible to argue that a vendee should recover all payments, even those made voluntarily in addition to the deposit, so long as the lender has knowledge of the underlying contract.

We disagree with that approach. We would not subordinate the lender's otherwise valid lien because of idiosyncratic actions taken by a vendee after the lender has recorded its mortgage. By the same token, we believe it would be inequitable to place a lender under an obligation to seek out and determine whether a purchaser intends to expend sums not provided for in the contract. *Howard v. Diolosa,* 241 *N.J.Super.* 222, 234, 574 *A.*2d 995 (App. Div.) (observing that "[b]ank loan officers are not detectives . . . and have no obligation to investigate an apparently regular transaction for latent defects or equities"), *certif. denied,* 122 *N.J.* 414, 585 *A.*2d 409 (1990).

■ We are persuaded, therefore, that the priority of a vendee's lien should not extend to those payments voluntarily made by the vendee after the lender properly records its mortgage or the vendee acquires actual knowledge of that encumbrance. The essence of the vendee's lien is to achieve a fair and just result in consideration of all parties and circumstances. As between a vendee with an unrecorded lien and a mortgagee with a recorded lien, we believe that the equities run in favor of the mortgagee who has no knowledge of the extent of sums to be advanced by the vendee and who has acted diligently and properly in recording the mortgage instrument.

In our view, a contrary conclusion would undermine the purposes of the recording statutes, which must be faithfully enforced to maintain the integrity of New Jersey's system of conveyances. *Palamarg, supra,* 80 *N.J.* at 453, 404 *A.*2d 21. In addition, granting a priority to construction lenders in these circumstances is well justified on policy grounds. As noted in the brief submitted by the New Jersey Land Title Association as *amicus curiae:*

[T]here are sound policy reasons for granting preferential treatment to construction lenders as against the vendee's lien. . . . The lender is providing funds which

go into improvements to the land and enhance the value of the property, thus enhancing the position of the vendee as well. The construction lender in most cases has its own internal loan underwriting requirement that the proposed house be under contract of sale. This underwriting requirement is intended to assure a level of financial safety and creditworthiness. By imposing this high standard for the loan, however, the lender is undermining his own position in the event of foreclosure, because his knowledge of the contract may result in the subordination of his position to the vendee's.... Title insurers are also confronted with a dilemma, because the lender insists that his title policy insure that he has a first lien, but the vendee in fact may enjoy a priority. Finally, the risk of suffering a loss of priority to the vendee must necessarily increase the cost of construction loans, by either increasing the interest rate which the lender will demand, or increasing the cost to close the loan by forcing the lender and borrower to obtain a subordination agreement from the purchaser. In either case, the increased costs are borne by the ultimate purchaser.

## IV.

In his separate opinion, our colleague implicitly rejects the above policies in favor of granting a priority to all payments by a vendee, even those made voluntarily, irrespective of an intervening recorded mortgage, provided that the mortgagee has knowledge of the vendee's contract. Our colleague contends that equity demands that result and argues that lenders may ameliorate any resultant hardship by requiring vendees to subordinate their interests. *Post* at 530, 753 *A*.2d at 1136.

We disagree. The fact that Roebling may have obtained a subordination agreement from the Coxes is no more dispositive of this dispute than the fact that the Coxes could have easily protected their interests by searching the chain of title at the local recording office. The approach advocated in the concurring-dissenting opinion would seem to reward purchasers who bypass the recording system established by the Legislature and who remain ignorant of *bona fide* liens against real property.

Stated differently, although we are mindful of the ability of lenders to obtain subordination agreements, that practice cannot itself dispose of the legal questions presented here. We reiterate that this dispute must be resolved by considering principles of equity together with the policy undergirding New Jersey's record-

ing statutes. Although a lender may seek to alter the effect of such principles by requiring a vendee to enter into a subordination agreement, the absence of such an agreement is not a reason to decide this case in favor of either side. Moreover, subordination clauses in real estate documents are not without their critics. Some scholars have noted:

> [T]he enforceability of such subordination clauses may be open to serious doubt. The purchaser will ordinarily be entirely unsophisticated, and is unlikely to have any concept of the significance of the clause. In addition, the clause will seldom contain details of the proposed construction financing to which the vendee is being asked to subordinate. By analogy to the cases involving so-called "automatic" subordination of purchase-money financing by land vendors to developers, it might well be argued that such subordinations by contract vendees are too vague or too unfair to enforce.

> [2 Nelson & Whitman, *supra*, § 13.3, at 287 (footnote omitted).]

Additionally, we do not share our colleague's restrictive view of the purposes underlying the recording statutes. The concurring-dissenting opinion states: "Because the recording statutes are intended primarily to address priority issues among purchasers *who have no knowledge* of prior encumbrances, they should not be invoked to resolve the priority issues in this appeal." *Post* at 530, 753 *A.*2d at 1136. Again, we disagree. The statutes are intended to protect not only purchasers but subsequent judgment creditors and mortgagees, entities or persons in exactly the same position as Roebling. "The principal purpose of enactment of the New Jersey recording act ... 'was to protect subsequent judgment creditors, bona fide purchasers, and bona fide mortgagees against the assertion of prior claims to the land based upon any recordable but unrecorded instrument.'" 29 *New Jersey Practice, Law of Mortgages* § 102, at 386 (Roger A. Cunningham & Saul Tischler (1975)) (paraphrasing *Glorieux v. Lighthipe* 88 *N.J.L.* 199, 202, 96 *A.* 94 (E. & A.1915)). One commentator has observed, the "provisions [of the recording statutes] are in reality a broad declaration of public policy." *Jones, supra,* 12 *Rutgers L.Rev.* at 329.

Our colleague also refers to an extensive litany of foreign case law, the inference being that a majority of jurisdictions would find

in favor of the Coxes. In reality, there is no case directly addressing plaintiffs' situation. We have no quarrel with the statement that "the vast majority of cases hold that a vendee has an equitable lien for the reimbursement of money advanced under the contract and make no distinction between obligatory and voluntary advances." *Post* at 522, 753 *A*.2d at 1117. We conclude much the same today. *Ante* at 497, 753 *A*.2d at 1131 ("Plaintiffs' payments, seemingly made in good faith, entitle them to be equitably vested with a ratable portion of the estate."). Our disagreement concerns how to determine the priority of plaintiffs' lien when measured against Roebling's recorded mortgage. The cases cited in the concurring-dissenting opinion do not answer that precise question.

In *Jaeger v. Hardy*, 48 *Ohio St.* 335, 27 *N.E.* 863 (1891), described as "the preeminent case," *post* at 522, 753 *A*.2d at 1131, the purchaser did not advance a series of voluntary payments after a lender properly recorded its mortgage. Rather, the purchaser in *Jaeger* was required by the contract to make a series of installment payments in accordance with a fixed schedule. Specifically, $100 was due on or before April 10, 1873; $50 was due on or before May 10, 1873; and the balance of the purchase price was due in twelve semi-annual payments of $100 each, with interest from April 1, 1873. *Ibid.*

Upon execution of a contract, prior to the recording of the subsequent mortgage, the purchaser took possession of the premises and remained in possession for ten years until the dispute arose on March 1, 1884. On August 8, 1874, the seller mortgaged the property to one Jaeger, who recorded the mortgage five days later on August 13, 1874. Importantly, at the time the mortgagee recorded the mortgage instrument, the vendee had already made many of the payments required by the contract. The seller defaulted on its loan to Jaeger and a dispute arose concerning the priority of the vendee's and mortgagee's respective interests. *Ibid.*

In deciding in favor of the vendee, the court noted in the first sentence of its decision, "[p]ossession of lands by a vendee under a contract for their future conveyance to him, is constructive notice of the contract, and of his equity in the land." *Id.* at 864. The court further noted, "[a] mortgage executed by the vendor, on the premises, *after the purchaser is put in possession,* is subordinate to his prior equity." *Ibid.* (emphasis added). Thus, the court relied heavily on the fact that the vendee was in actual possession of the premises for ten years prior to the commencement of the lender's action, making all required payments during that time. That is not the case here. The equities portrayed in *Jaeger* are far afield from the equities evident in the case at bar.

Our colleague also cites to several cases for the proposition that "[o]ther jurisdictions likewise have held that monies advanced under a contract to buy real property represent a lien superior to that of a subsequent mortgagee who executes a mortgage to the vendor *with knowledge* of the preexisting interest." *Post* at 523, 753 *A.*2d at 1132. That proposition ignores the quantum or value of the interest that the other jurisdictions have granted the vendee as well as significant distinctions from the present case.

In *National Indemnity Co. v. Banks,* 376 *F.*2d 533, 534 (5th Cir.1967), a builder entered a contract with the purchasers for the property and for the construction of a home for $15,000. At the time of the contract the builder did not own the property but was to purchase it from the seller for $3,500. The deed to the property was to be placed in escrow pending the builder's purchase. *Ibid.* The purchasers conveyed the equity in their existing home to the builder and received a credit of $6,700 toward the purchase price. A construction lender provided the builder with $11,400 to complete the construction of the home and recorded its mortgage interest. The house was completed and the purchasers occupied the house prior to the scheduled settlement date. *Ibid.* However, on the settlement date the builder could not convey clear title to the purchasers because of the builder's failure to pay

the $3,500. Thus, the builder did not own the property. *Ibid.* A fire later destroyed the home and the issue of priority of a lien arose between the lender and the purchasers with regard to insurance money. *Ibid.* In finding the purchasers had a valid vendees' lien for $6,700 superior to that of the lender, the court noted the undisputed testimony that the lender "had actual notice of the $6,700 payment made by the [purchasers]." *Id.* at 535.

Although our colleague cites *National Indemnity* as support for concluding the Coxes had a superior lien for monies paid after Roebling recorded its mortgage, that case supports our view. Similar to the construction lender in *National,* Roebling had actual knowledge of the $12,000 deposit that was stated in the Coxes' contract. However, Roebling had no actual knowledge of the additional advances that the Coxes made after it recorded its mortgage interest and, therefore, its mortgage had priority over the Coxes' subsequent payments. Thus, the cases may be harmonized.

Additionally, in *Larson v. Metcalf,* 201 *Iowa* 1208, 207 *N.W.* 382, 383 (1926), the purchaser entered into a land sale contract with the seller and paid $10,000 for the property on March 1, 1920. On the same date the purchaser took possession of the property by and through a tenant. *Ibid.* On August 6, 1921, the seller declared a forfeiture and properly served the purchaser. About the same time, the purchaser instituted an action to recover the $10,000 payment. Following the purchaser's action, the seller conveyed the land to one Metcalf, a banker, on August 10, 1921. *Ibid.* Prior to the seller's conveyance to Metcalf, the bank for which Metcalf worked requested security for money the seller owed the bank. *Id.* at 385. The seller informed Metcalf he would receive notes and a mortgage from the purchaser and "would put them up for security." *Ibid.* Metcalf met with the purchaser and asked the purchaser about his contract with the seller. There was conflicting testimony at trial concerning whether Metcalf knew the purchaser paid the seller $10,000. *Id.* at 385–86. The Supreme Court of Iowa found that Metcalf, prior to taking the deed to the

land, had both actual and constructive notice of the purchaser's interest. *Id.* at 386. The court found that the purchaser had a vendee's lien in the amount of his $10,000 payment.

*Larson* is distinguishable from the present case in that the Coxes did not take possession of the property personally or through a tenant. Also, unlike the purchaser of the property in *Larson,* neither Roebling nor any of its agents met with the Coxes to discuss their interest in the property. Finally, unlike the purchaser in *Larson* who filed a lawsuit prior to the time the seller conveyed the property, the Coxes did not file a lawsuit for their deposit money or their additional advances until after Roebling acquired and recorded its mortgage. In addition to those distinctions, the purchaser in *Larson* recovered the amount of the original payment made *prior to* the subsequent purchaser's interest (in effect, the same relief as here).

In *Shirley v. Shirley,* 1845 WL 2932, *1 (Ind.1845), the purchasers entered into a contract for the sale of land with the seller on October 4, 1838, and paid an initial deposit of $382.42 toward the total purchase price of $1,600. In December 1838, the purchasers paid an additional sum of $109.05. The purchasers then offered to pay the seller the remainder of the purchase price but the seller refused to comply with the contract and thereafter sold the land to one Monicle. *Ibid.* The court found that the purchasers had a vendees' lien for the amount of money paid toward the purchase price prior to the sale of the property to Monicle. *Id.* at 3. In reaching its decision, the court found that Monicle had a conversation with the purchasers prior to his purchase of the land and knew they had a claim on the land. *Ibid.* The court also found that the subject matter of the conversation consisted of the purchasers informing Monicle that if he purchased the property, they would claim a lien for the money that they had paid. *Ibid.* The court concluded that Monicle purchased the property with full knowledge of the purchasers' equity and that he took the land subject to the vendees' lien. *Ibid.*

In *Shirley*, the purchasers' interest was valued at the amount they paid toward the purchase price prior to the intervening interest of the subsequent purchaser. Thus, the case, as the others referred to above, supports a finding in favor of the Coxes for their initial deposit made prior to Roebling's recorded mortgage and about which Roebling had knowledge at the time it acquired its interest. The case does not, however, address advances made after a subsequent purchaser or creditor has acquired an interest in the property and has recorded that interest. *Shirley* is significantly different from the present case in that, unlike the situation in *Shirley*, Roebling never had a meeting or conversation with the Coxes that would have informed Roebling of their intended future payments.

Further, in *Palmer, supra*, 510 *P*.2d at 270, the purchaser entered into a contract with a land developer for the sale of property and construction of a home for $35,000 on May 29, 1969. The contract provided for a $3500 down payment and contained a clause that provided that if the contract was breached by the seller or terminated by the purchaser, the $3500 down payment would be returned to the purchaser. *Ibid.* The land developer received a loan from a lender in the amount of $26,250, and the lender took back a mortgage on July 7, 1969. The lender recorded its mortgage on July 31, 1969. *Ibid.* The land developer defaulted and abandoned the construction project. *Ibid.*

In finding the purchaser had a vendee's lien in the amount of $3,500 superior to the lender's lien, the court stated "[a]n inchoate vendee's lien was created ... when the contract for construction of the house was signed." *Id.* at 274. The court also found "[a]n incomplete mortgage lien existed" when the lender executed the mortgage. *Ibid.* The court stated that "[b]ecause of the chronological order in which the liens originated, the vendee's lien of [the purchaser] in the amount of $3,500 is prior and superior to the mortgage lien." *Ibid.* However, unlike the present case, *Palmer* addresses the vendee's lien only with regard to deposit monies and not additional advances made by the purchaser after the lender

obtained and recorded its mortgage, without knowledge of the purchaser's additional advances.

In *Lowe v. Maynard,* 115 *S.W.* 214 (Ky.1909), the purchasers entered into a contract for the sale of land and paid the seller $200. A total of $600 was due on or before April 3, 1907. The purchasers alleged that they complied with the conditions of the contract by paying the remainder of the purchase price on or before the due date. *Ibid.* The seller sold the land to one Scalf who in turn sold it to one Leslie. *Id.* at 215. The court found that the original purchasers were entitled to the $200 and that the subsequent purchasers purchased the land subject to the rights of the original purchasers. *Ibid.* In so holding, the court found that both Scalf and Leslie "actually knew of the prior purchase by the [purchasers] and of the fact that the [purchasers] had paid a part of the purchase money." *Ibid.* To the extent that *Lowe* supports a finding that the Coxes were entitled to a vendee's lien in the amount of their initial deposit, we agree. However, *Lowe* does not address the question concerning the vendee's superior rights to a lien for monies advanced after a subsequent party obtains an interest, without knowledge of the original purchaser's intended advances toward the purchase price.

In *South Carolina Federal, supra,* 413 *S.E.*2d at 853, the lender, a bank, took a mortgage for a construction loan that it gave to a real estate developer for the construction of a condominium project. As a precondition to the loan, the developer had to "presell" a certain number of residential units in the project. *Ibid.* Several purchasers entered into contracts with the developer and made cash down payments. The contracts required the developer to refund the deposit money if it did not complete the contract within two years. *Ibid.* At the time it made the construction loan, the bank knew that the developer entered into the contracts with the purchasers and received deposit money. The developer defaulted on its obligations to the bank and failed to complete the construction of the condominium project within the two-year time frame as required by its contracts with the purchasers. *Id.* at 854.

The court held that "the equitable liens of the [p]urchasers under earlier contracts of sale, of which the [b]ank had notice, take priority over the [b]ank's lien under its later construction loan agreement and mortgage." *Id.* at 855. One distinguishable aspect between the present case and *South Carolina Federal* is that unlike the lender in *South Carolina Federal*, the lender in the present case did not require that the developer "presell" the property prior to the granting of the loan. Although it was a "factor" in Roebling's decision to grant RKA construction funds, it was not required. Additionally, to the extent that *South Carolina Federal* allows the purchasers to recover their deposit monies, it is not at odds with the rule enunciated today.

In sum, the present case requires us either to enhance or diminish the effect of a properly-recorded mortgage. We choose to enhance the effect of the mortgage while, at the same time, affording priority to a fair portion of a vendee's lien. In so doing, we believe our decision will provide greater stability and predictability to our system of land titles, which, in turn, will benefit buyers, sellers, and lenders alike. To the extent that the cases and outside statutes cited by our colleague would provide a rationale to exempt purchasers from the effects of the notice provisions of the recording statutes, we decline to adopt such a rule for the several reasons already noted.

## V.

There remains the question whether to apply our decision prospectively. Briefly stated, "[p]rospective application is appropriate when a decision establishes a new principle of law by overruling past precedent or by deciding an issue of first impression." *Montells v. Haynes,* 133 *N.J.* 282, 295, 627 *A.*2d 654 (1993) (citing *Coons v. Am. Honda Motor Co.,* 96 *N.J.* 419, 427, 476 *A.*2d 763 (1984), *cert. denied,* 469 *U.S.* 1123, 105 *S.Ct.* 808, 83 *L.Ed.*2d 800 (1985)). In determining how to apply a new rule, we must weigh, among other things, "whether retroactive applications could produce substantial inequitable results." *Ibid.*

Prior to this appeal, there was little precedent on which the parties could definitively rely and no direct authority in New Jersey. Given the paucity of cases, the lack of uniformity among other jurisdictions, and the arcane nature of this subject, we are not surprised that the appellate judges below disagreed on the quantum of relief. For the reasons stated, we are convinced that this opinion clarifies the law in a manner consistent with equitable principles, sound policy, and New Jersey's recording statutes. Nonetheless, because of the uncertainty in the law at the time of these transactions, the Coxes should not be required to bear the consequences of this decision.

> Our tradition is to confine a decision to prospective application when fairness and justice require. The tradition is particularly appropriate when "a court renders a first-instance or clarifying decision in a murky or uncertain area of the law ...," *Oxford Consumer Discount Co. v. Stefanelli*, 104 *N.J.Super.* 512, 521, 250 *A.*2d 593 (App.Div.1969), *aff'd*, 55 *N.J.* 489, 262 *A.*2d 874 (1970), or when a member of the public could reasonably have "relied on a different conception of the state of the law," *ibid.; see also Coons, supra*, 96 *N.J.* at 425–27, 476 *A.*2d 763 (stating that sound policy considerations, such as justifiable reliance, purpose of new rule, or adverse effect of retroactivity, may justify prospective applications).
>
> [*Montells, supra*, 133 *N.J.* at 297–98, 627 *A.*2d 654.]

Accordingly, we conclude that prospective application of our holding provides the fairest and most equitable disposition.

## VI.

We affirm the judgment of the Appellate Division to the extent that it grants priority to the Coxes' vendees' lien as against Roebling's mortgage interest, for the amount of their initial deposit and all sums later advanced toward the purchase price of the property. In all subsequent matters, whose operative facts arise after the date of this opinion, we will apply a rule of law consistent with our holding here.

STEIN, J., concurring in part and dissenting in part.

The Court has determined that as between contract purchasers of property who make non-obligatory payments under their contract, and construction lenders with knowledge of that contract,

the recorded lien of the construction lenders is superior and has priority over a vendee's common law lien for those non-obligatory payments. The Court concludes that the underlying purpose of New Jersey's Recording Statutes, *N.J.S.A.* 46:21–1 and 46:22–1, requires that result. I disagree with today's ruling, pursuant to which contract purchasers who make non-obligatory payments to their builder subsequent to the builder's obtaining a construction loan secured by a recorded mortgage have a lien inferior to that of the mortgagee even if the mortgagee had knowledge of the contract.

I concur with the balance of the Court's holding to the effect that a Vendee's lien generally is superior to that of a mortgagee with notice of the vendee's interest, and that today's holding should be prospective—thereby entitling the Coxes to recoup the monies they have expended. I believe, however, that the Court has unduly emphasized the role of New Jersey's recording statutes in this case; has diminished the significance of common-law equitable principles; and has overlooked the significance of generally accepted real estate practices, including the routine and standard practice of obtaining a subordination of the vendee's lien in situations where third parties, with notice of the vendee's prior claim, become the vendor's buyers or creditors. I therefore dissent from the remainder of the Court's holding.

I

The facts of this case are unique. Nevertheless, the basic principles are well settled and uniformly accepted. The doctrine of equitable conversion is a fundamental tenet of property law. *See* 3 *American Law of Property* §§ 11.22–.40 (A. James Casner, ed.1952) (observing that "from the viewpoint of a [subsequent] transferee who has knowledge or notice of the [prior] contract [between the vendor and the vendee], the vendor holds a naked legal title as security for himself and as trustee for the contract vendee"). Likewise, the superiority of a vendee's lien over a subsequent creditor with notice of the vendee's claim is undisput-

ed. *See, e.g.,* W.R. Habeeb, *Right of Vendee under Executory Land Contract to Lien for Amount Paid on Purchase Price,* 33 *A.L.R.*2d 1384 (1954). The intertwining of the doctrines of equitable conversion and vendees' liens with the everyday practices of construction lenders and developers provides the jurisprudential backdrop against which this appeal should be decided.

## A

Under the doctrine of equitable conversion, at the moment of signing a specifically enforceable contract between a purchaser and a seller of real property—because property is unique and monetary damages are therefore presumed not to compensate fully an injured party—the purchaser's interest in the contract is converted into real estate and the seller's interest into personal property. See, *e.g., Thompson on Real Property,* §§ 4447–4448 (1963). As such, the purchaser is regarded in equity as the owner of the property, as well as the debtor for the purchase money, and the seller of the property is viewed as a secured creditor for the purchase money. *Id.* at § 4447. Thus, in equity, the purchaser has a real interest and the seller a personal interest, and each party holds his interest as a trustee for the other party. *Ibid.; People's Water Co. v. Millville,* 95 *N.J. Eq.* 732, 123 *A.* 747 (E. & A.1924); *American Law of Property, supra,* § 11.40. At the time that the executory contract for the sale of real property becomes effective, the seller retains only the bare legal title and the purchaser becomes the equitable owner. *Thompson, supra,* § 4447.

That conversion of the parties' interests results from general equity jurisprudence: that equity regards as having been done that which ought to be done and which equity would order done, *i.e.,* the conveyance of the title to the purchaser and payment of the price to the seller. C.C. Langdell, *A Brief Survey of Equity Jurisdiction* at 263 (2d ed.1904). Frequently, the doctrine is invoked to allocate the rights and obligations incident to the real property and to determine the powers of creditors of each party to

reach the property in payment of claims owing to them. See, *e.g.,* *City of Milwaukee v. Greenberg,* 163 *Wis.*2d 28, 471 *N.W.*2d 33, 36–40 (1991) (discussing various contexts in which vendor is found to be "owner," under doctrine of equitable conversion, for purposes of allowing creditors to reach property); *Cooke v. Firemen's Ins. Co. of Newark,* 119 *N.J.Super.* 248, 251, 291 *A.*2d 24 (App.Div. 1972) (holding buyers to be equitable owners of building and thus permitted to purchase fire insurance to protect their interest).

Inextricably entwined with and arising from the doctrine of equitable conversion is the concept of the vendee's lien, which is "a natural result of the recognition of a trust relationship between the vendor and the vendee, after contract executed, payment of part of the consideration and a default." *Reilly v. Griffith,* 141 *N.J. Eq.* 154, 163, 56 *A.*2d 502 (Ch.1947). A vendee's lien is created, through the doctrine of equitable conversion, when a purchaser of real property has advanced part payment of the purchase price to the vendor, who subsequently defaults on the contract. The lien gives the purchaser the right to recoup the value of the benefit he or she bestowed on the seller out of the real property itself, which stands as security for the repayment of purchase money paid.

"The vendee's lien is of ancient origin and it has been recognized and enforced in this State since at least 1830." *Mihranian v. Padula,* 134 *N.J.Super.* 557, 563, 342 *A.*2d 523 (App.Div.1975), *aff'd o.b.,* 70 *N.J.* 252, 359 *A.*2d 473 (1976) (citing *Copper v. Wells,* 1 *N.J. Eq.* 10 (Ch. 1830), in which the court found that where specific performance had become impossible, a purchaser who has paid money for improvements valueless to him but beneficial to owner has in equity a lien on the property). The lien arises from the interplay among general equity jurisprudence, the doctrine of equitable conversion and the trust relationship that exists between the parties to a contract for the sale of real property. See 77 *Am.Jur.2d, Vendor and Purchaser,* §§ 512–516; 4 *Pomeroy's Equity Jurisprudence* § 1263 (5th ed.1941).

The rationale behind the enforcement of a vendee's lien is primarily equitable:

[W]hen a purchaser has paid his purchase-money, though he has got no convey-ance, the vendor becomes a trustee for him of the legal estate, and he is in equity considered the owner of the estate. When, instead of paying the whole of his purchase-money, he pays a part of it, it would seem to follow, as a necessary corollary: that to the extent to which he has paid his purchase-money, to that extent the vendor is a trustee for him; .in other words, that he acquires a lien exactly in the same way as if, upon the payment of part of the purchase-money, the vendor had executed a mortgage to him of the estate to that extent.

[*Craft v. Latourette*, 62 *N.J. Eq.* 206, 207, 49 *A.* 711 (Ch.1901)(citing *Rose v. Watson*, 10 *H.L. Cas.* 672).]

The overarching goal of the vendee's lien is to ensure that a vendee may have the opportunity to recoup his or her investment in real property. That a vendee's lien is superior to liens of other purchasers who have purchased with knowledge of the vendee's equitable interest is a basic principle of property law. 29 *New Jersey Practice, Law of Mortgages* § 101, at 374 (Roger A. Cunningham & Saul Tischler) (1975).

## B

One recognized authority suggested that all priority disputes can be reduced to disputes between two legal interests, two equitable interests or a combination of the two. 2 *Pomeroy's Equity Jurisprudence* §§ 677–734f. If the priority dispute is between a prior equitable interest and a subsequent legal interest, the subsequent legal interest will prevail only if it is acquired for value and without notice of the prior equitable interest. *Ibid.* That principle is indirectly the source of race-notice recording acts.

The earliest recording statutes in America were enacted when, having traveled to this country seeking new land to settle, colonists began to view land as a commodity and needed a system to protect both existing titles and good faith purchasers against defective titles. 6A Richard R. Powell, *Powell on Real Property,* ¶ 904[1][b] (1990). The recording acts in effect today have their genesis in those statutes, enacted as early as 1640. *Ibid.* Follow-ing the Revolutionary War, the federal government began to adopt

requirements for the recording of interests in real property. *Ibid.* The government's impetus was the settlement of western areas of the country and the need for "efficient and principled settlement of this new land." *Ibid.* Then, as now, the purpose of the recording acts was to protect bona fide purchasers who, without notice of prior liens, made investments in real property. *Ibid.;* *N.J.S.A.* 46:22–1. A secondary purpose of recording acts is to provide purchasers with a public record from which prospective purchasers may ascertain the existence of prior claims that may affect their prospective interests. *Ibid.*

The ultimate purpose of New Jersey's recording statutes, *N.J.S.A.* 46:21–1 and 46:22–1 (the Act), is to "permit[ ] purchasers to rely upon the record title and to purchase and hold title to lands within this state with confidence." *Palamarg Realty Co. v. Rehac,* 80 *N.J.* 446, 453, 404 *A.2d* 21 (1979) (citing *Jones, The New Jersey Recording Act–A Study of its Policy,* 12 *Rutgers L.Rev.* 328, 329–30 (1957)). Necessarily, the Act thus provides a public record within which prospective purchasers may search for any prior claims on a specific property.

Pursuant to the Act, New Jersey is a race-notice jurisdiction. *Palamarg, supra,* 80 *N.J.* at 454, 404 *A.2d* 21. Since 1727, race-notice statutes have been interpreted not to allow subsequent purchasers with notice of the prior interest to prevail over the prior interests. *Blades v. Blades,* 1 *Eq. Cas. Abr.* 358, pl. 12, 21 *Eng. Rep.* 1100 (Ch. 1727). Likewise, this Court has interpreted New Jersey's Act to mean "that if a common grantor sells the same land to two persons, the first to record—even though he may have been the second to purchase—will prevail, but only so long as he had no actual notice of the earlier sale." *Palamarg, supra,* 80 *N.J.* at 454, 404 *A.2d* 21.

Recording statutes, generally, do not resolve priority issues in cases in which those statutes do not apply. Thus, New Jersey's Act, *N.J.S.A.* 46:22–1, does not assist in resolving the issue before the Court because it does not apply to the facts of this case. Where, as here, the recording statute does not apply, the issue of

priority must be decided in accordance with common law legal and equitable principles.   6A Powell, *supra,* ¶ 905[3][c].

## C

One other relevant facet of real-estate law is that of subordination agreements.   That mortgagees may agree to determine their relative priorities in the mortgaged property is well established. See *Lovett v. Demarest,* 5 *N.J. Eq.* 113 (Ch. 1845).   Subordination agreements are a means of establishing and altering the priorities between mortgagees.   The validity, generally, of subordination agreements has been accepted in New Jersey since at least 1845. *Ibid.*

Subordination agreements are commonplace in both residential and commercial real-estate practice.   They can provide for automatic subordination of a prior lien to the contemplated construction loan mortgage.   Form subordination agreements are readily available to parties involved in real-estate transactions.

"Modern real estate development practice often requires extensive use of subordination ... agreements."   Cunningham and Tischler, *supra,* § 115 at 535.   Cunningham and Tischler posit that "use of a subordination agreement is appropriate whenever a landowner seeks a new loan on the security of land already encumbered by a mortgage or some other interest less than a fee simple" and the new lender desires to hold a first mortgage in the property. *Ibid.*

## II

The majority correctly applies established principles of real estate law when it determines that the Coxes' lien for $12,000, the amount of its initial deposit, is superior to Roebling's recorded mortgage.   *Ante* at 522, 753 *A.2d* at 1131.   I depart from the Court's reasoning, however, on the narrow issue of the priority of the Coxes' lien for their additional payments of $71,225.53 to RKA, which were made subsequent to the recording of Roebling's

mortgage. In my view, the purposes of New Jersey's recording statute would not be undermined, and the public policy underlying that statute would be better served, if the Coxes' lien were held superior even for non-obligatory payments as between them and a mortgagee with actual notice of the vendee's equitable interest.

The majority observes that "[s]ome jurisdictions have held that the vendee may recover his or her deposit monies whenever 'the subsequent lender knows that a contract has been executed, whether or not it is aware of the terms of the contract, the vendee's identity, or the precise amount of any down payment made.'" *Ante* at 504, 753 *A.2d* at 1121 (citations omitted). The Court then notes that "it is possible to argue that a vendee should recover all payments, even those made voluntarily in addition to the deposit, so long as the lender has knowledge of the underlying contract." *Ibid.* The Court declines, however, to follow that reasoning. Instead, the Court chooses to enhance the status of the recording statutes, applying them in a context in which a mortgagee has actual notice and an opportunity, through subordination, easily to avoid any potential priority problem. The Court's approach is inconsistent with the overarching goal of the vendee's lien—the protection of vendees.

A

Although no case law addresses the precise issue before the Court today, the vast majority of cases hold that a vendee has an equitable lien for the reimbursement of money advanced under the contract and make no distinction between obligatory and voluntary advances.

In the preeminent case addressing the priority of payments made under a contract to purchase real property, *Jaeger v. Hardy,* 48 *Ohio St.* 335, 27 *N.E.* 863, 864 (1891), the Ohio Supreme Court held that "[a] mortgage executed by the vendor, on the premises, after the purchaser is put in possession [thereby giving notice to the subsequent mortgagee of the vendee's interest], is subordinate

to his prior equity." The *Jaeger* court noted that a purchaser need not examine the records for subsequent mortgages *"nor is the record constructive notice to him."* *Ibid.* (emphasis added). The court held that "[u]ntil *actual* notice of the incumbrance, he may safely continue to make payments of the purchase money to his vendor in pursuance to the contract." *Ibid.* (emphasis added). Thus, under Ohio's rule, until a vendee has *actual* notice of a subsequent mortgage, any payments made on the sales contract constitute an equitable lien that is superior to the mortgage. *See also Wayne Building & Loan Co. v. Yarborough,* 11 *Ohio St.*2d 195, 228 *N.E.*2d 841, 848 (1967) (observing that "[w]here the vendee continues to pay out purchase money under his contract to purchase real estate without *actual* notice of a recorded mortgage, which is held by a mortgagee who took with notice of the vendee's rights under his contract, the vendee has ... been held entitled to priority as against such mortgagee, for the amounts he has actually paid before such actual notice"). *Cf. Myers v. Parsley,* 1986 *WL* 3279, *1 (Ohio App.1986) (noting that "if the purchaser has actual notice of a lien on the vendor's interest, and continues to make payment to the vendor, he gives up his priority, and subjects his interest to attachment up to the amount of such payments").

Other jurisdictions likewise have held that monies advanced under a contract to buy real property represent a lien superior to that of a subsequent mortgagee who executes a mortgage to the vendor *with knowledge* of the preexisting interest. *See generally National Indem. Co. v. Banks,* 376 *F.*2d 533, 534 (5th Cir.1967) (holding that *"a vendee* upon default by the *vendor* has an equitable lien on the land for the reimbursement of money advanced upon it"); *Poole v. Atlanta Joint Stock Land Bank,* 189 *Ga.* 59, 5 *S.E.*2d 368, 371 (1939) (same); *Shirley v. Shirley,* 1845 *WL* 2932, *3 (Ind.1845) (finding vendee's lien superior to mortgagee and explaining that "[t]he lien is to secure to the vendee the repayment of his expenditures made in pursuance of the contract"); *Larson v. Metcalf,* 201 *Iowa* 1208, 207 *N.W.* 382, 385 (1926) (holding vendee's lien superior and noting that "[a] vendee

has a lien on land purchased by him for the purchase-money, or any part of it, paid by him, if the vendor refuses to convey, and this lien attaches to the land in the hands of a subsequent purchaser with notice"); *Lowe v. Maynard,* 115 *S.W.* 214, 215 (Ky.1909) (observing that "vendee under an executory contract for the sale and purchase of real property has an equitable lien or estate in the amount paid of the purchase price if the contract fails"); *Clough v. Clough,* 42 *Ky.* 64, 1842 *WL* 3271, *2 (1842) (finding subsequent purchaser had actual notice of vendee's interest in land and that, therefore, vendee's lien was superior); *Gribble v. Stearman & Kaplan, Inc.,* 249 *Md.* 289, 239 *A.2d* 573, 577 (1968) (same); *Palmer v. Crews Lumber Co.,* 510 *P.2d* 269, 274 (Okla.1973) (recognizing "that a vendee is entitled, in equity, to a lien on land which is the subject of the sales contract, to the extent of the payments made on the purchase price"); *South Carolina Federal Savings Bank v. San–A–Bel Corp.,* 307 *S.C.* 76, 413 *S.E.2d* 852, 854 (1992) (recognizing that "the purchaser under an executory contract for the purchase and sale of real property has an equitable lien on the property in the amount paid on the purchase price").

Because no case law exists addressing the precise issue before the Court, an analogy to a situation in which a mortgagee enters into a future advance mortgage is informative and appropriate. See *ante* at 503, 753 *A.2d* at 1121.

Future advance mortgages typically provide that "the property encumbered by the mortgage stands as security not only for the funds advanced at the time the mortgage is executed and delivered, but also for any obligations incurred after the initial advance." James B. Hughes, *Future Advance Mortgages: Preserving the Benefits and Burdens of the Bargain,* 29 *Wake Forest L.Rev.* 1101, 1102 (1994). Construction loans are a form of future advance mortgage. *Id.* at 1107. See *also* Grant S. Nelson & Dale A. Whitman, *Rethinking Future Advance Mortgages: A Brief for the Restatement Approach,* 44 *Duke L.J.* 657, 670 (1995). Typically, a construction loan will secure a stated maximum amount and

will include a clause providing that, after the initial advance, subsequent advances will follow to total a sum equal to or less than the stated amount in the mortgage. *Hughes, supra,* at 1102. Irrespective of the precise structure of a construction mortgage, the determination of the lien priority of future advance mortgages against a subsequent lien holder turns on whether the advances are obligatory or optional and what constitutes notice to the future advances mortgagee. The optional/obligatory advance doctrine holds that if a mortgagee is contractually obligated to make advance, those advances will be senior to any intervening lien irrespective of notice. *Nelson & Whitman, supra* 44 *Duke L.J.* at 669. Thus, in New Jersey, in keeping with the general rule,

> [i]t is well settled that a duly recorded advance money mortgage, where the making of the advances is *obligatory* upon the mortgagee, creates a valid lien for the full amount actually advanced thereunder (up to the stated maximum) as against all subsequent claims, ... even if the advance money mortgagee continues to make advances after he has actual notice of the subsequent claim. Thus the advance money mortgagee has priority over all subsequent judgment creditors, purchasers, and mortgagees even as to advances made after he had actual notice of subsequent judgments against, or conveyances by, the mortgagor.
>
> [Cunningham & Tischler, *supra,* § 111 at 493 (emphasis added) ].

However, in a situation in which future advances are optional under the terms of the first mortgage and the first mortgagee has notice of an intervening lien or interest, that intervening lien or interest may take priority over the first mortgage. Conversely, *where the "first mortgagee has no notice of a subsequent encumbrance, an optional advance will take priority* regardless of whether it was made before the intervening lien attached." *La Cholla Group, Inc. v. Timm,* 173 *Ariz.* 490, 844 *P.*2d 657, 659 (1992) (emphasis added). *See also Bank of Ephraim v. Davis,* 559 *P.*2d 538 (Utah 1977).

When a first mortgagee has notice of the intervening lien, whether the intervening interest takes priority over the first mortgage depends on the type of notice that the first mortgagee receives.

Prior to 1982, that *actual* notice of a subsequent encumbrance was required before optional advances would lose their lien priori-

ty was settled in New Jersey. *See Central Trust Co. v. Continental Iron Works,* 51 *N.J. Eq.* 605, 607, 28 *A.* 595 (E. & A. 1893) (observing that "mortgages for future advances ... have priority for all advances made before actual notice of subsequent encumbrances"); *Weinstein v. Anderson,* 102 *N.J. Eq.* 8, 10, 139 *A.* 602 (Ch.1927) (noting that the "undoubted rule adopted in this state is ... [that the first] mortgage is superior to the extent of advances made, until actual notice is obtained of the intervention of a later incumbrance"); *Durling v. Stillwell,* 74 *N.J. Eq.* 697, 700, 69 *A.* 978 (Ch.1908) (recognizing that "a mortgage given to secure future advances ... is entitled to priority over subsequent encumbrances for all advances made prior to actual notice of the subsequent encumbrance"); *Ward v. Cooke,* 17 *N.J. Eq.* 93 (Ch. 1864) (recognizing general rule and adding that "the notice must be an *actual,* not a *constructive*[,] notice").

In 1982, however, the Chancery Division, in *Lincoln Federal Savings & Loan Association v. Platt Homes, Inc.,* 185 *N.J.Super.* 457, 449 *A.*2d 553 (1982), chose not to follow prior case law when it determined that the recording statutes required that constructive notice be "on a par with actual notice" when determining the effect of constructive notice of intervening liens of optional advances. *Id.* at 464–65, 449 *A.*2d 553. Instead, the Chancery Division found that the public policy of supporting and maintaining the integrity of the recording statute required that an optional advance be viewed as "a new mortgage taken as of the time such advance is made." *Id.* at 467, 449 *A.*2d 553. Thus, the court held that "constructive notice of intervening liens is sufficient to defeat the priority position of a construction mortgagee as to optional future advances." *Id.* at 466–67, 449 *A.*2d 553.

The *Lincoln* court's holding is in contrast with the majority of American jurisdictions that "require that the first mortgagee have *actual* notice of the subsequent lien before [its] claim will be subordinated." Hughes, *supra,* 29 *Wake Forest L.Rev.* at 1115 (emphasis added). Most jurisdictions thus hold that constructive notice such as that derived from recording statutes is insufficient

to impute knowledge of an intervening lien. *See, e.g., Mobley v. Brundidge Banking Co.,* 347 *So.*2d 1347, 1349–50 (Ala.1977); *Dempsey v. McGowan,* 291 *Ark.* 147, 722 *S.W.*2d 848, 850 (1987); *Idaho First Nat'l Bank v. Wells,* 100 *Idaho* 256, 596 *P.*2d 429, 433–34 (1979); *Freese Leasing v. Union Trust & Sav. Bank,* 253 *N.W.*2d 921, 925 (Iowa 1977); *Potwin State Bank v. J.B. Houston & Son Lumber Co.,* 183 *Kan.* 475, 327 *P.*2d 1091 (1958); *Axel Newman Heating & Plumbing Co. v. Sauers,* 234 *Minn.* 140, 47 *N.W.*2d 769, 772 (1951); *North v. J.W. McClintock, Inc.,* 208 *Miss.* 289, 44 *So.*2d 412, 414 (1950); *Housing Mortgage Corp. v. Allied Constr., Inc.,* 374 *Pa.* 312, 97 *A.*2d 802, 805–06 (1953); *McMillen Feed Mills, Inc. v. Mayer,* 265 *S.C.* 500, 220 *S.E.*2d 221, 225–27 (1975); *Bank of Ephraim, supra,* 559 *P.*2d at 541; *Colonial Bank v. Marine Bank,* 152 *Wis.*2d 444, 448 *N.W.*2d 659, 660 (1989); *La Cholla Group, supra,* 844 *P.*2d at 659.

Consistent with the majority rule, some states have enacted statutes that redefine "notice" to clarify that only actual written notice delivered to the future advances lender will deprive it of its priority. See *Me.Rev.Stat. Ann,* tit. 33, § 505(5)(B) (West 1994); *Neb.Rev.Stat.* § 76–238.01(1)(b) (1990); *Ohio Rev.Code Ann.* § 5301.232(B) (Baldwin Supp.1993); *R.I. Gen. Laws,* § 34–25–10(b) (1984); *Vt. Stat. Ann.* tit. 8, § 1207 (1984); *W. Va.Code* § 38–1–14(e) (Supp.1994). Several states also statutorily provide that all future advances, whether optional or obligatory, take the priority of the original mortgage and therefore are superior to any intervening liens. Those statutes also provide for a 'cutoff' notice. *Fla. Stat. Ann.* § 697.04(1)(b) (West Supp.1995); *Me.Rev.Stat. Ann.* tit. 33, § 505(5)(A) (West 1994); *Mo. Ann. Stat.* § 443.055(6) (West 1994); *Mont.Code Ann.* § 71–1–206(3) (1993); *Neb.Rev.Stat.* § 76–238.01(1)(a) (1990); *Nev.Rev.Stat. Ann.* § 106.380(1) (Michie 1994); *N.C. Gen.Stat.* § 45–72 (1991); *Ohio Rev.Code Ann.* § 5301.232(C) (Baldwin 1993); *Or.Rev.Stat.* § 86.155(3) (1988); *R.I. Gen. Laws,* § 34–25–11 (1984); *Tenn.Code Ann.* §§ 47–28–105 to –110 (1988); *Va.Code Ann.* § 55–58.2 (Michie Supp.1994). A cutoff notice is "a notice issued . . . to the future advances lender

that freezes advances at their current level." *Nelson & Whitman, supra* 44 *Duke L.J.* at 686.

The Restatement (Third) of Property (Mortgages) (1996) (*Restatement*) also adopts the position that "subsequent advances made under a future advance mortgage should have the same priority as the original advance thereunder, but only until the first mortgagee receives a so-called 'cut-off' notice from the mortgagor." *Hughes, supra* 29 *Wake Forest L.Rev.* at 1120 (citing *Restatement* § 2.3 cmt. b). (Presumably, providing such a notice would be a condition imposed by the subsequent lienor). The Restatement does not distinguish between obligatory and optional advances made by the first mortgagee. *Restatement* § 2.3 cmt. a. The different priority accorded optional and obligatory payments has been criticized severely. *See, e.g.,* 4 *Pomeroy's Equity Jurisprudence, supra,* § 1199; 2 Grant Gilmore, *Security Interests in Personal Properties,* § 35.4, at 930 (1965) (discussing "the conceptually nonsensical distinction between 'obligatory' and 'voluntary' " and observing that result of distinction is creation of "a wide area of judicial discretion" that "amounts to an absence of rule").

The majority places great reliance on *Lincoln* when it analogizes the facts of the Coxes' case to those in cases in which mortgagees make future advances on their mortgages. *Ante* at 503, 753 *A*.2d at 1121. The majority states that "[v]endees who voluntarily advance payments after notice of an intervening interest must be viewed, like the mortgagee in *Lincoln,* as having made such payments at their peril." *Ante* at 504, 753 *A*.2d at 1121.

I believe that the majority errs when it relies on the Chancery Division's *Lincoln* opinion. The better rule is that of the majority of jurisdictions which hold that constructive notice of a subsequent and intervening lien is insufficient to deprive parties such as the Coxes of priority. The rationale supporting that rule is that the prior mortgagee should not be obliged "to search the records, from day to day, to learn whether his mortgagor has made any further encumbrances, or to ascertain that of which notice must be given him, by the persons interested." *Bank of Ephraim, supra,*

559 *P.*2d at 541. *See also Hughes, supra* at 1127 (observing that "there appears to be no adequate reason for a court ... to afford [a subsequent mortgagee] priority over the first mortgagee" where that subsequent mortgagee is given notice of a mortgage containing a future advances clause).

Moreover, to hold as the majority does imperils the expectations and intentions of construction lenders, thereby "imped[ing] the construction of improvements on ... land and the commencement of other business ventures [that] in the long run diminishes the net wealth of the community." *Nelson & Whitman, supra,* 44 *Duke L.J.* at 667, 674, 679 (observing that "construction lenders fully expect[ ] and intend[ ] all advances to have the priority of the original mortgage" and noting that under the minority rule the "prior mortgagee may safely make optional advances only if it obtains a title examination before each advance"). The *Restatement* places the burden on a second mortgagee to take affirmative steps to ensure that the first mortgagee is aware of the second mortgagee's position by requiring that a cutoff letter be issued to the first mortgagee before its priority can be affected. *Restatement* § 2.3. A cutoff letter is analogous to the subordination of a prior lien. Just as the actual delivery and acceptance of a cutoff letter protects a second mortgagee's priority, so too does subordination. As noted, Roebling easily could have protected its lien merely by obtaining a subordination of the Coxes' lien.

Consistent with the generally accepted principles of equitable conversion, the priority of vendees' liens and the optional/obligatory doctrine in the area of future advance mortgages, the Coxes' payments to RKA of over seventy-five thousand dollars, made with no notice of but subsequent to the recording of Roebling's mortgage, should be superior to that mortgage, and that the payments were optional and not mandated by the contract is of no moment.

B

The purpose of the recording statutes is to "permit[ ] purchasers to rely upon the record title and to purchase and hold title to

lands within this state with confidence." *Palamarg, supra,* 80 *N.J.* at 453, 404 *A.2d* 21 (quoting *Jones, supra,* 12 *Rutgers L.Rev.* at 329–30). The recording statutes are intended to protect all purchasers, including those such as the Coxes, but particularly bona fide purchasers. *N.J.S.A.* 46:22–1 (stating that instruments or deeds that are not recorded are "void and of no effect against ... subsequent bona fide purchasers and mortgagees ... *not having notice thereof,* whose deed shall have been first duly recorded") (emphasis added). However, situations arise that fall outside the purview of the recording statutes. On the facts of this case, because Roebling had actual notice of the Coxes' interest, Roebling is not a bona fide purchaser; therefore, the recording statutes have, at most, a minimal bearing on the proper resolution of this case. Because the recording statutes are intended primarily to address priority issues among purchasers *who have no knowledge* of prior encumbrances, they should not be invoked to resolve the priority issues in this appeal.

Thus, that Roebling properly recorded its mortgage is not pertinent because the Coxes were not obligated to search for subsequent creditors' liens. *See, e.g., Jaeger v. Hardy, supra,* 27 *N.E.* at 864 (noting that a purchaser "is not bound to examine the records for ... incumbrances, nor is the record constructive notice to him"). Even had the Coxes undertaken a title search prior to making its first payment to RKA, no encumbrances on the property would have been revealed. Likewise, Roebling's title search revealed no encumbrances on the property because the Coxes' interest was not recorded, and was not required to be recorded. Accordingly, common-law legal and equitable principles must be invoked to resolve the priority dispute at issue. See 6A Powell, *supra,* ¶ 905[3]. In my view, the equities run in favor of requiring a mortgagee to ensure that known and outstanding liens on the to-be-mortgaged property are subordinated if that mortgagee seeks the superior lien on the property.

Among real-estate professionals, it is the practice to require subordination "whenever a landowner seeks a new loan on the

security of land already encumbered by a mortgage." Cunning-ham and Tischler, *supra*, § 115 at 535. Although requiring subor-dination clauses in contracts and mortgages imposes an additional burden on mortgagees, that burden is minimal and is already an established practice among professional in real-estate transactions. *Ibid.* (observing that majority of professionals involved in real estate transactions already have embraced the practice of subordi-nation of liens). In practice, most banks would be unwilling to enter into a construction loan like the one at issue here unless the contract purchaser consented to the mortgage and agreed to subordinate the vendee's lien. *See Arundel Federal Sav. & Loan Ass'n v. Lawrence*, 65 *Md.App.* 158, 499 *A.*2d 1298, 1303 (1985) (finding clause in sales contract equivalent to subordination clause and observing that loan officer from bank stated "that if [subordi-nation] language is not in the contract of sale, he would have the buyer sign a separate 'consent to mortgage' form").

By comparison, to require vendees such as the Coxes to under-take a title search every time they wish to make an optional payment pursuant to the contract, which is effectively what the majority opinion holds, imposes an enormous burden. See *Bank of Ephraim, supra*, 559 *P.*2d at 541 (recognizing burden involved in requiring first mortgagee to search records "from day to day" to learn of future encumbrances); *La Cholla Group, supra*, 844 *P.*2d at 659 (same).

Instances where vendees make additional payments for addi-tional work not contemplated by the contract are not uncommon. Purchasers of undeveloped property on which construction is contracted for frequently will request changes in the construction as it progresses. Those changes generally are outside the con-tract and unknown to the mortgagee. The majority's holding requires, in effect, that payment by a buyer outside the contract for changes or "extras" requires a title search to be conducted if the priority of the vendee's lien is to be preserved. Basic princi-ples of equity mandate that the burden of subordination and title

searches be placed on that party best-equipped for the task—the mortgagee.

### III

I concur in the Court's determination that its new rule of law should apply prospectively. However, because I believe that the equities run in favor of a holding that requires banks to bear the burden of ensuring that their loans are superior to other outstanding encumbrances on real property, I dissent from that part of the majority's opinion that holds otherwise.

*For affirmance*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, COLEMAN and VERNIERO—5.

*Concurring in part and dissenting in part*—Justice STEIN—1.